**FILED**

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

DEC 22 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
                    DEPUTY CLERK

|  |  |
|---|---|
| United States of America | ) |
| v. | ) |
|  | ) |
|  | ) Case No. |
| Everitt Aaron Jameson | ) |
|  | ) **1:17-MJ-00225-BAM** |
|  | ) |
| *Defendant(s)* | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of ___Oct. 24, 2017 through Dec. 20, 2017___ in the county of ___Stanislaus___ in the ___Eastern___ District of ___California___, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. Section 2339B | Attempt to Provide Material Support to Foreign Terrorist Organization |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Christopher Mckinney, F.B.I Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___December 22, 2017___

_____
*Judge's signature*

City and state: ___Fresno, California___

Barbara A. McAuliffe, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AFFIDAVIT for COMPLAINT | CASE NO. |
| | COMPLAINT |

I, Christopher McKinney, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of complaint for a violation of 18 U.S.C. 2339B, namely attempting to provide material support and resources to a designated foreign terrorist organization.

2.     I am a Special Agent with the Federal Bureau of Investigation, and have been since September 2010.  I received 22 weeks of law enforcement training at the FBI Academy at Quantico, during which investigations of national security and criminal matters were discussed at length.  I was assigned to investigate criminal violations and have drafted and executed arrest and search warrants on matters relating to civil rights violations, complex white collar crimes, public corruption and violent crimes against children.  In June 2017, I joined to the FBI Joint Terrorism Task Force located in Ripon, California and am assigned to investigate violations of domestic terrorism and international terrorism, including violations of 18 U.S.C. § 2339B (providing, attempting to provide, or conspiring to provide material support or resources to designated foreign terrorist organizations).

3.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.
Based on the facts set forth in this affidavit, there is probable cause to believe that Everitt Aaron Jameson has attempted to provide material support to a foreign terrorist organization in violation of 18 U.S.C. §2339B.

**RELEVANT STATUTES**

4.     Title 18, United States Code, Section 2339B imposes criminal liability on a person who "knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so[.]"  In order to violate the law, "a person must have knowledge that the organization is a designated terrorist organization" or that it "has engaged or engages in terrorist activity . . . or that the organization has engaged or engages in terrorism . . . ."  18 U.S.C. § 2339B(a)(1).

5.     Under 18 U.S.C. § 2339B(g)(4), the term "material support or resources" is defined as set forth in 18 U.S.C. § 2339A(b)(1), as follows:

> [A]ny property, tangible or intangible, or service, including currency or monetary instrument or financial security, financial services, lodging, training, expert advice or assistance, safe houses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials[.]

6.     On or about October 15, 2004, the United States Secretary of State designated al- Qaeda in Iraq (AQI), then known as Jam 'at al Tawid wa' al-Jahid, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive order 13224.  On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant (ISIL) as its primary name. The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham ("ISIS" – which is how the FTO will be referenced herein), The Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS.  To date, ISIS remains a designated FTO.

## PROBABLE CAUSE

7.     As set forth in more detail below, Jameson has espoused radical jihadi beliefs, including authoring social media posts that are supportive of terrorism, communicating with people he believes

2

share his jihadi views and offering to provide services to such people, including in the form of his presumably employer-provided tow truck in service of the "cause." Jameson also has voiced support for the October 31, 2017, terror attack in New York City during which a driver used his truck to kill 8 people. Jameson commonly refers to people he perceives to be enemies of radical Islam as "kufr," a derogatory Islamic term for unbelievers, and specifically told an FBI Confidential Human Source (CHS) that he "beg[ged] to join the cause against darul kuffar." Darul (or Dar al, variant Dar ul) signifies the "land of disbelief" and commonly is used by radical Islamists as a label for the United States or western nations. Most recently, Jameson met with a person (an FBI Undercover Employee, "UCE2") he believed to be associated with senior leadership of the foreign terrorist organization ISIS and described to the UCE2 his interest in planning and undertaking a violent attack in San Francisco in support of ISIS. Jameson also described providing the UCE2 with other forms of support, including financial support.

8.   On September 19, 2017, a credible FBI Confidential Human Source (CHS) [1] who has accurately reported to the FBI on national security matters in the past, reported a suspicious Facebook account. The Facebook persona was Everitt Aaron Jameson, vanity everittj. The Facebook id # was hidden. The CHS reported Jameson was "Liking" and "Loving" posts that were pro-ISIS and pro terrorism. To provide an example of the types of posts Jameson was "Liking" and "Loving" during this time period, the CHS reported to the FBI that Jameson "loved" a post on November 29, 2017 that is an image of Santa Claus standing in New York with a box of dynamite. The text of the post reads, "ISIS post image of Santa with dynamite threatening attack on New York." The Propaganda poster shows Santa Claus standing on a roof next to a box of dynamite looking out over a crowd of shoppers with the words "We meet at Christmas in New York…soon." Under this post, Jameson selected the "Like" option and then selected the "Heart" option to signify that he "Loved" the post.

9.   On October 24, 2017, the CHS and Jameson communicated via private messages. During those communications, Jameson stated that he was committed wholehearted [to the cause].

---

[1] The FBI opened the CHS on or about July 16, 2017. FBI considers this source reliable and his/her information has been corroborated as about 12/20/17. The CHS has been paid approximately $2600.00 for his services.

10.   On October 27, 2017, Jameson messaged the CHS stating with, "Salaam Alaykium warmatualAllah wabarakatu, I am here to beg to join the cause against darul kuffar. I'm ready." The CHS replied, "Wa alaykumi as-salam. Patience."

11.   On October 29, 2017, the CHS messaged Jameson, "Are you a revert?" Jameson replied, "Yes. I am. That is what will make me more useful. I can blend in. Or shock and awe." The CHS replies, "When did you say your Shahada. Yes. Allah does things this way!" Jameson responded, "Amin! Allah is the best of planners. I took my Shahada two years ago. At the Merced Islamic Center of Merced CA USA." The CHS replied "Alhamdulillah! and I see from some of your postings you work for a lift service - so you are not kuffar police. Again patience. I am at a cafe and need to log off. Have a blessed day." Jameson answered, "I am a tow truck driver. So I can make these services available as well. Sabr. InshAllah we will speak soon again. Salaam Alaykuim warmatulAllah wabarakatu Sister. May Allah reward you for your good work."

12.   Based on my training and experience, the above-referenced communications reflect that Jameson was establishing his Islamic credentials with the CHS, after which he offered his services as a tow truck driver to the CHS for purposes of supporting "the cause against darul kuffar." Based on my training and experience and the context of Jameson's interactions with the CHS, I assess that Jameson perceives "the cause" to signify engaging in terrorism to undermine the United States.

13.   The CHS reported that on October 31, 2017, Jameson posted "Walokiom assalaam rhmatullaha wabarakatu.  Yes the will.  As today they celebrate Shaytan.  A'oodah Billah.  The Kuffar will learn the lesson soon enough InshaAllah.  And it's ok.  I have sabr.  I understand.  Today is the day the Kuffar are going to revel in sin."  The CHS then reported that Jameson posted a GIF of a crowd giving a standing ovation to an article discussing the October 31, 2017, terror attack by an individual who crashed a rented pickup truck into a group of cyclists and runners, killing 8 people and injuring 11 people in New York City.

14.   The CHS reported that on November 2, 2017, the CHS had a conversation about the October 31, 2017, terror attack. Jameson stated to the CHS, "Allahu Akbar! It says he was one of us. May Allah Grant him Jannah firtuidus Amin". The CHS replied to Jameson by asking the question, "Us?" Jameson responded "Muslim sister. I heard he was uzbek Muslim." To this, the CHS replied,

4

1  "Yes!" Jameson then responded, "Alhamdulillah. I'm glad to know we Muslims are finally hitting back.

2  Allahu Akbar! The Kuffar deserve everything and more for the lives they have taken."

3       15.    Based on my training and experience, the above-referenced communications reflect that

4  Jameson identifies himself as associated with the same cause as the perpetrator(s) of the New York City

5  terror attack. According to the indictment charging Sayfullo Saipov with the terror attack, he agreed to

6  provide material support to ISIS, further supporting my belief that Jameson is or is attempting to

7  provide material support to ISIS. "Jannah firtuidus Amin" is an Islamic term referring to paradise, and

8  I assess that Jameson's use of this term reflects that he hopes the perpetrator(s) of the New York City

9  terror attack were received into paradise.

10       16.    On November 3, 2017, Jameson filled out a "Franchise Tow Truck Driver Application"

11  with the Modesto Police Department (MPD) to be affiliated with a local towing company which has a

12  contract with the City of Modesto. In the application, Jameson listed his telephone number as **209-xxx-**

13  **xxxx** and identified as his residence an address in Modesto I have verified through physical

14  surveillance is Jameson's personal residence.

15       17.    On November 27, 2017, FBI Special Agents from the Fresno FBI office conducted

16  surveillance in the vicinity of the local towing company. Jameson was observed in front of the local

17  company wearing work clothes consistent with employment.

18       18.    On December 7, 2017, an FBI surveillance team conducted surveillance in the vicinity of

19  the local towing company and observed Jameson driving a tow truck around the greater Modesto, CA

20  region.

21       19.    On December 11, 2017, an FBI employee ("UCE1") working in an undercover capacity

22  began using a social media platform to communicate with Jameson.

23       20.    On December 12, 2017, UCE1 messaged Jameson, stating among other things, "We are

24  in desperate times." Jameson responded by stating, among other things, "Cal [*sic*] on me when I'm

25  needed. Anything for Dar al Islam. Anything for our Ummah."

26       21.    The following day (December 13), UCE1 engaged in communications with Jameson in

27  which he explained among other things that "the Sheikhs" wanted to know how Jameson was "able to

28  help" and "to make sure you (Jameson) are ready." Jameson stated, "Anything. Tell them anything. I

1  can suit up and take myself to our brothers. Or whatever they need done here." Jameson continued,

2  "Alhamdulillah. I know this very well. I have no doubt. I am ready. Give the word and it shall be

3  done."

4       22.    Thereafter, UCE1 reiterated, "I know you mentioned you will help in anyway is there

5  anything specific you had in mind which you believe would be helpful in this work? If not it is ok akhi.

6  Allah is the best of planners". Jameson replied (in substance) "I was a soldier in the Kuffar army

7  before I reverted. I have been trained in combat and things of war. In Sha Allah anything of that

8  nature, as well as funding. Anything for Allah. He is the best of planners Alhamdulliah. In Sha Allah,

9  I will be waiting." UCE1 replied "Indeed. I will pass this along and by the grace of Allah we will talk

10  soon." Jameson replied, "Jazak Allah, In Sha Allah we will speak about the same time."

11       23.    Based on my training and experience and review of documents in the investigation, I

12  believe Jameson's reference to "I was a soldier in the Kuffar arm" refers to Jameson's prior military

13  experience. In particular, Jameson's discharge papers from the U.S. Marine Corps (DD-214 and related

14  documents) reflects that in or about June 2009, Jameson attended basic recruit training and graduated

15  several months later. During this time, Jameson earned a "sharpshooter" rifle qualification. Although

16  Jameson ultimately was discharged from the U.S. Marine Corps for fraudulent enlistment (it was

17  revealed that Jameson failed to disclose a latent asthma history), I am informed and believe Jameson

18  intended to and did offer to provide to UCE1 his military experience, including his expertise with rifle

19  marksmanship.

20       24.    On December 14, 2017, UCE1 messaged Jameson and stated among other things, "I have

21  news for you but I trust you know that what we are talking about and sharing is between you, me and

22  Allah only." UCE1 continued, "A brother will be contacting you in the next day or so." Jameson

23  replied " … I will be waiting with anticipation." UCE1 then inquired with Jameson as to a way for his

24  brother" (associate) to contact Jameson, and Jameson provided the UCE with a telephone known to be

25  used by Jameson which Jameson confirmed to the UCE was his only cell phone. The UCE then

26  discussed with Jameson his plan for facilitating contact between the UCE's "brother" and Jameson.

27       25.    On December 16, 2017, UCE2, mentioned previously in Paragraph 7, sent Jameson a text

28  message on the known cellular telephone associated with Jameson which was the number he provided

1   as his contact number. UCE2 referred to the instructions UCE1 and Jameson discussed on December

2   14 (described above) and confirmed that he was contacting Jameson pursuant to the UCE'S

3   instructions, by stating among other things, "I am in the area today if you want to meet let me know."

4   Jameson confirmed his readiness and availability to meet, replying "InshaAllah, yes. Where at Akhi?"

5   UCE2 and Jameson then exchanged additional communications regarding a future meeting.

6          26.     Eventually, the UCE2 and Jameson successfully arranged a meeting. As he explained his

7   preparation to travel to the meeting, Jameson told the UCE2, " … I'm getting my family's car now.

8   I'm on my way." During this communication, FBI physical surveillance observed Jameson departing

9   the residence in a black Chrysler 300. Jameson drove the vehicle directly to a location he previously

10  discussed with UCE2.

11         27.     On December 16, 2017, at approximately 17:50, Jameson followed a series of directional

12  commands provided by the UCE2 to Jameson to locate the UCE2's vehicle (the ultimate meeting

13  destination). Jameson was then directed to sit in the passenger seat of the vehicle, directly in front of

14  the UCE2. Within minutes of entering the vehicle, Jameson expressed that he was willing to do

15  anything for "the cause." Jameson said that he was ready. UCE2 questioned Jameson and asked if he

16  knew who he was meeting with. Jameson acknowledged that he understood and confirmed that he did

17  not disclose the meeting to anyone. UCE2 stated that he did not want there to be any confusion or doubt

18  and asked Jameson if he knew who Abu Bakr al-Baghdadi was. Jameson stated that he did know, and

19  UCE2 informed Jameson that UCE2's boss was al-Baghdadi. Jameson provided a positive response

20  and appeared pleased with UCE2's affiliation. Based on my training and experience, I am aware Abu

21  Bakr al-Baghdadi is the leader of the foreign terrorist organization "Islamic State of Iraq and al-Sham"

22  (ISIS). I believe Jameson's response demonstrates Jameson's awareness that he was meeting with a

23  person he believed to be affiliated with the senior leadership of ISIS. This is consistent with my review

24  of other information including postings Jameson made on his Facebook page supportive of ISIS, further

25  demonstrating his knowledge of and support for ISIS.

26         28.     During the meeting, the UCE2 stated that he heard Jameson had something to offer and

27  asked for further clarification. Jameson said that he was an Infantryman and was well versed in the

28  "Anarchist Cookbook" (a reference to a book I am aware is publicly available and discusses among

7

1  other things the construction of improvised explosives and devices).  The UCE2 asked Jameson about

2  his capabilities. Jameson responded that he was a tow truck driver, had the ability to provide money,

3  and was willing to travel to Syria. Jameson volunteered that he got paid twice a month and could

4  provide $400 per month.  On three or four separate occasions, the UCE2 encouraged Jameson to go

5  home and think about what he was saying. The UCE2 told Jameson he should take time to think about

6  moving forward, but Jameson rebuffed the UCE2's requests, maintaining that he was ready and

7  prepared to proceed.

8    29.    Eventually, Jameson stated that we need something along the lines of New York or San

9  Bernardino.   Based on my training and experience, I am aware that Jameson's mention of "San

10  Bernardino" refers to a shooting-related terrorist attack undertaken in 2015; I believe the "New York

11  attacks" Jameson mentioned refers to the same October 31 terrorist attack discussed above.  Jameson

12  identified a possible target location, noting that the best place would be a large area such as San

13  Francisco.  The UCE2 told Jameson that San Bernardino and New York were distinctly different

14  attacks and asked for clarification. Jameson replied that he wanted to use a combination of the two

15  (which I believe is a reference to inflicting casualties through the use of a vehicle and firearms).

16    30.    Jameson specifically named Pier 39 in San Francisco as a target location because he had

17  been there before and knew that it was a heavily crowded area, and that, according to Jameson, no

18  reconnaissance or site survey would be necessary (because Jameson already was familiar with the area).

19  Jameson explained that he also desired to use explosives, and described a plan in which explosives

20  could "tunnel" or "funnel" people into a location where Jameson could inflict casualties.  UCE2 asked

21  Jameson about the operational timeline. Jameson replied that he could do it this week (the week of

22  December 18 through December 25, 2017).  Jameson also stated that Christmas was the perfect day to

23  commit the attack.  When asked by UCE2, Jameson said he did not have and did not need an escape

24  plan because he was ready to die. UCE2 instructed Jameson not to do anything without his knowledge

25  and said that he would need to get approval from his bosses (a reference to al-Baghdadi). Jameson

26  acknowledged that he understood.

27    31.    UCE2 asked Jameson what assistance the UCE2 could provide. Jameson stated that he

28  needed ammunition, powder, tubing, and nails.  When asked what kind of a weapon he would need,

1  Jameson noted that he would prefer an assault rifle.  He also explained that he was trained in both the

2  M-16 and an AK-47 rifle.  Jameson also stated that he needed timers and remote detonators

3  (presumably for the explosive charges Jameson previously described to the UCE2).  Jameson said that

4  he could get the PVC pipe, nails, and powder (presumably, black powder used for commercial

5  explosives and ammunition). Based on my training and experience, I am aware that rudimentary

6  explosives, such as pipe bombs, may be constructed with such readily-available materials as pipes,

7  nails and explosive powder (such as black powder used in rifle ammunition reloading).

8       32.  UCE2 asked Jameson if he had a suitable location to build the devices. Jameson replied

9  that he would go to the mountains, build the devices at a remote campground, and then return home

10  where he would store the devices.  UCE2 asked Jameson if he was willing to do a video or write a

11  statement for the brothers.  Jameson stated that he would write a statement, but he would need UCE2's

12  help in doing a video.  UCE2 advised that he would be in contact and ended the meeting.

13       33.  Shortly after the meeting concluded, Jameson transmitted a text message to UCE2

14  confirming "It is written."  Jameson further explained that "It is half a page long and by me.  It's in my

15  hand, and stated it's me.  In Sha Allah it will be what is needed.  I will be back late night tomorrow.

16  Around 11pm to Midnight."

17       34.  Later, on December 18, 2017, UCE2 initiated contact with Jameson and asked if they

18  were meeting that day, and also asked if he can get pictures of the trip we are going to take for "Xmas".

19  In response, Jameson sent a photograph depicting a map of Pier 39, and 2 photographs depicting areas

20  of what appears to be Pier 39.  He also sent one photograph depicting what appeared to be Pier 39.

21       35.  Later on December 18, 2017, an FBI employee, using an identifiable telephone number

22  with a Washington, D.C. area code (202) mistakenly called Jameson's cellular telephone.  After

23  Jameson answered in apparent Arabic language, the FBI employee immediately terminated the call.

24  Shortly afterwards, Jameson called the 202 telephone number, which resolves to a voice mail

25  identifying the name (but not employing agency) of user of the 202 telephone.

26       36.  Later during that afternoon (December 18, 2017), UCE2 and Jameson again engaged in

27  communications regarding a follow-up meeting.  Among other things, UCE2 asked Jameson whether

28  he could locate and rent a storage unit for use in preparing for their operation.  Jameson confirmed that

1    he could and later advised UCE2 that he had possibly located a storage unit.

2        37.    Later during the evening, the UCE2 contacted Jameson to discuss arranging a follow-up

3    meeting. Jameson responded by indicating that he had been "very busy tonight." Moreover, Jameson

4    told the UCE2, "I also don't think I can do this after all. I've reconsidered." The UCE2 stated, "We

5    only can do Allahs will," and Jameson replied "In Sha Allah one day I can. But I can't."

6        38.    On December 20, 2017, a search warrant, issued in the United States District Court for

7    the Eastern District of California on December 19, 2017, was executed at the residence located in

8    Modesto, CA. at 8:04 .The purpose of the search was to gather evidence in support of the ongoing

9    investigation.

10       39.    Among the items seized was a white envelope containing handwritten letter signed by

11   Abdallah Abu Everitt Ibn Gordon Al-Amriki dated 12/16/17.   That letter reads as follows:

12                        12-16-17

13   I Abdallah adu Everitt ibn Gordon have committed these acts upon the
     Kuffar, in the name of Dar al Islam, Allahu AKbar! You all have brought

14   this upon yourselves. There are no innocent Kuffar! Each and every
     Kuffar in this Nationalistic, Godless society has a hand in this. You've

15   Allowed Donald J Trump to give away Al Quds to the Jews. Both You
     and he are wrong, it belongs to the Muslemeen. We have penetrated and

16   infiltrated your disgusting country. These Acts will continue until the
     Lions of Islam overtake you. Turn to Allah, make tawbah and fight with

17   us, the soldiers who fight in the day and the night. Allah SWT is most
     forgiving, I am not. Long live Isil, Long Live Abu Bakr al-Baghdadi.

18   Allahu Akbar!

19   Abdallah abu Everitt ibn Gordon al-Amriki

20   (signature)

21       40.    One envelope was also found that contained the Last Will and Testament of Everitt

22   Aaron that was executed on 11/16/17.

23       41.    In addition the following firearms and firearm related material were  seized:   One

24   dealer's receipt of sale of firearm to Everitt Aaron Jameson, Sr. dated 01/03/17;  two .45 caliber

25   magazines: One empty, one containing 7 rounds of ammunition, three cylinder fireworks in a paper

26   back, once cylinder firework in black material, one Winchester .22 caliber rifle, One Rugers Model

27   M77, one black ammunition holder, containing six rounds of ammunition, One Sturm, Ruger 9mm

28

handgun, one empty handgun magazine.

42.     During the search of the residence, FBI Agents interviewed Jameson.  At periodic times during that interview Jameson stated his support of ISIS and terrorism and discussed aspects of the plan to carry out an attack, noting that he would be happy if an attack was carried out.

### REQUEST TO SEAL

43.     I further request that the Court order that all papers in support of this complaint be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  According, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,


Christopher McKinney
Special Agent
Federal Bureau of Investigation

SWORN TO BEFORE ME, AND SUBSCRIBED
IN MY PRESENCE THIS ___ DAY OF
DECEMBER, 2017.


Hon. Barbara A. McAuliffe
U.S. MAGISTRATE JUDGE


/s/ Dawrence W. Rice, Jr.
Approved as to form by
AUSA DAWRENCE W. RICE, JR.