MCGREGOR W. SCOTT
United States Attorney
DAWRENCE W. RICE, JR.
CHRISTOPHER D. BAKER
Assistant United States Attorneys
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone:  (559) 497-4000
Facsimile:  (559) 497-4099

BRENDA SUE THORNTON
Trial Attorney
U.S. Department of Justice
National Security Division, Counterterrorism Section
950 Pennsylvania Ave., N.W. Room 7633
Washington, DC  20530
Telephone: (202) 353-7951

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.  1:18-CR-00001 LJO |
| Plaintiff, | PLEA AGREEMENT |
| v. | |
| EVERITT AARON JAMESON, | DATE: TBD |
| Defendant. | TIME: TBD<br>COURT: Hon. Lawrence J. O'Neill |

## I.     **INTRODUCTION**

### A.     Scope of Agreement

The indictment in this case charges the defendant in Count One of the indictment with

Attempting to Provide Material Support and Resources to a Designated Foreign Terrorist Organization,

in violation of 18 U.S.C. §§ 2339B(a)(1) and 2, and in Count Two of the indictment with Distribution of

Information Relating to Destructive Devices, in violation of 18 U.S.C. § 842(p)(2)(A).

Pursuant to Federal Rules of Criminal Procedure, Rule 11(c)(1)(C), the government and the

defendant agree that a specific sentence of Fifteen (15) years imprisonment and a supervised release term of life would be appropriate in this case.

This document contains the complete plea agreement between the United States Attorney's Office for the Eastern District of California (the "government") and the defendant regarding this case. This plea agreement is limited to the United States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

**B.**   <u>**Court Not a Party**</u>

The Court is not a party to this plea agreement.  Under the provisions of Federal Rules of Criminal Procedure, Rule 11(c)(3), the Court may accept or reject the plea agreement, or may defer its decision as to the acceptance or rejection until there has been an opportunity to consider the presentence report.  If the Court accepts the plea agreement, the Court will inform the defendant that it will embody in the judgment and sentence the disposition provided for in this plea agreement.  If the Court rejects this plea agreement, the Court shall so advise the defendant, allow the defendant the opportunity to withdraw his plea, and advise him that if he persists in a guilty plea the disposition of the case may be less favorable to him than is contemplated by this plea agreement.

## II.   DEFENDANT'S OBLIGATIONS

**A.**   <u>**Guilty Plea and Sentencing Agreement**</u>

The defendant will plead guilty to Count One of the indictment, Attempting to Provide Material Support and Resources to a Designated Foreign Terrorist Organization, in violation of 18 U.S.C. §§ 2339B(a)(1) and 2.  The defendant agrees that the defendant is in fact guilty of the charge and that the facts set forth in the Factual Basis for Plea attached hereto as Exhibit A are accurate.

Pursuant to Rule 11(c)(1)(C), the defendant agrees that a specific sentence of Fifteen (15) years imprisonment and a supervised release term of life would be appropriate in this case.

The defendant understands and agrees that the statements made by him in signing this Agreement, including the factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings, even

if the defendant fails to enter a guilty plea pursuant to this Agreement.  The defendant waives any rights under Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence, to the extent that these rules are inconsistent with this paragraph or with this Agreement generally.

The defendant agrees that this plea agreement will be filed with the Court and become a part of the record of the case.

**B.     Special Assessment**

The defendant agrees to pay the mandatory special assessment of $100.  If the defendant is unable to pay the special assessment at the time of sentencing, the defendant agrees to earn the money to pay the assessment, if necessary by participating in the Inmate Financial Responsibility Program.

**C.     Defendant's Violation of Plea Agreement or Withdrawal of Plea**

If the defendant, violates this plea agreement in any way, withdraws his plea, or tries to withdraw his plea, this plea agreement is voidable at the option of the government.  The government will no longer be bound by its representations to the defendant concerning the limits on criminal prosecution and sentencing as set forth herein.  One way a defendant violates the plea agreement is to commit any crime or provide any statement or testimony which proves to be knowingly false, misleading, or materially incomplete.  Any post-plea conduct by a defendant constituting obstruction of justice will also be a violation of the agreement.  The determination whether the defendant has violated the plea agreement shall be decided under a probable cause standard.

If the defendant violates the plea agreement, withdraws his plea, or tries to withdraw his plea, the government shall have the right: (1) to prosecute the defendant on any of the counts to which the defendant pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this plea agreement; and (3) to file any new charges that would otherwise be barred by this plea agreement.  The defendant shall thereafter be subject to prosecution for any federal criminal violation of which the government has knowledge, including perjury, false statements, and obstruction of justice.  The decision

to pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

By signing this plea agreement, the defendant agrees to waive any objections, motions, and defenses that the defendant might have to the government's decision to exercise the options stated in the previous paragraph. Any prosecutions that are not time-barred by the applicable statute of limitations as of the date of this plea agreement may be commenced in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement of any such prosecutions. The defendant agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as of the date of this plea agreement.

In addition: (1) all statements made by the defendant to the government or other designated law enforcement agents, or any testimony given by the defendant before, after, or as part of this plea agreement, shall be admissible in evidence in any criminal, civil, or administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by the defendant before, after, or as part of this plea agreement, or any leads derived therefrom, should be suppressed. By signing this plea agreement, the defendant waives any and all rights in the foregoing respects.

## III.     THE GOVERNMENT'S OBLIGATIONS

### A.     Sentencing Agreements

#### 1.     Sentence

Pursuant to Rule 11(c)(1)(C), the government agrees that a specific sentence of Fifteen (15) years imprisonment and a supervised release term of life would be appropriate in this case.

#### 2.     Acceptance of responsibility

The government will recommend a three offense level reduction in the calculation of the

applicable advisory guideline range, if the defendant clearly demonstrates acceptance of responsibility for his conduct as defined in U.S.S.G. § 3E1.1.  This includes the defendant meeting with and assisting the probation officer in the preparation of the pre-sentence report, being truthful and candid with the probation officer, and not otherwise engaging in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the preparation of the pre-sentence report or during the sentencing proceeding.

> 3.    Count to be dismissed

The government agrees to dismiss Count Two of the indictment, Distribution of Information Relating to Destructive Devices, in violation of 18 U.S.C. § 842(p)(2)(A), at the time of sentencing.

**B.    Use of Information for Sentencing**

The government is free to provide full and accurate information to the Court and the United States Probation Office ("Probation"), including answering any inquiries made by the Court and/or Probation, and rebutting any inaccurate statements or arguments by the defendant, his attorney, Probation, or the Court.  The parties agree that voluminous discovery has been provided by the government to the defense, and no further production of discovery by the government is contemplated at this time.  The defendant also understands and agrees that nothing in this Plea Agreement bars the government from defending on appeal or collateral review the sentence imposed by the Court.

## IV.    ELEMENTS OF THE OFFENSE

At a trial, the government would have to prove beyond a reasonable doubt the following elements of the offense to which the defendant is pleading guilty:

As to Count One, Attempting to Provide Material Support and Resources to a Designated Foreign Terrorist Organization, in violation of 18 U.S.C. §§ 2339B(a)(1) and 2:

1.    First, the defendant intended to provide material support or resources to a foreign terrorist organization;

2.    Second, the defendant knew that the organization was a designated foreign terrorist organization, or that the organization had engaged or was engaging in terrorist activity or terrorism; and

3.    Third, the defendant did something that was a substantial step beyond mere planning

toward committing the crime of providing material support or resources to a foreign
terrorist organization.

The defendant fully understands the nature and elements of the crime charged in the indictment to which the defendant is pleading guilty, together with the possible defenses thereto, and has discussed them with his attorney.

## V.     MAXIMUM SENTENCE

### A.    Maximum penalty

The maximum sentence that the Court can impose is twenty (20) years of incarceration, a fine of $250,000, a period of supervised release of any term of years or life, and a special assessment of $100.

### B.    Violations of Supervised Release

The defendant understands that if the defendant violates a condition of supervised release during the term of supervised release, the Court may revoke the term of supervised release and require the defendant to serve an additional term of imprisonment of up to two (2) years pursuant to 18 U.S.C. § 3583(e)(3).

## VI.     SENTENCING DETERMINATION

### A.    Statutory Authority

The defendant understands that the Court must consult the Federal Sentencing Guidelines and take them into account when determining a final sentence. The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines and must take it into account when determining a final sentence. The defendant understands that the U.S.S.G. § 3A1.4 terrorism enhancement applies to the calculation of the defendant's base offense level and criminal history category. The defendant further understands that the Court will consider whether there is a basis for departure from the guideline sentencing range (either above or below the guideline sentencing range) because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

Pursuant to Federal Rules of Criminal Procedure, Rule 11(c)(1)(C), the government and the defendant stipulate and agree that a specific sentence of Fifteen (15) years imprisonment and a supervised release term of life would be reasonable and appropriate in this case under the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a).

## VII.   WAIVERS

### A.   Waiver of Constitutional Rights

The defendant understands that by pleading guilty the defendant is waiving the following constitutional rights:  (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to subpoena witnesses to testify on his behalf; (e) to confront and cross-examine witnesses against him; and (f) not to be compelled to incriminate himself.

### B.   Waiver of Appeal and Collateral Attack

The defendant understands that the law gives the defendant a right to appeal his guilty plea, conviction, and sentence.  The defendant agrees as part of his plea, however, to give up the right to appeal the guilty plea, conviction, and the sentence imposed in this case as long as the sentence of imprisonment does not exceed Fifteen (15) years.  Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if one of the following circumstances occurs: (1) the sentence of imprisonment imposed by the District Court exceeds Fifteen (15) years, and/or (2) the government appeals the sentence in the case.  The defendant understands that these circumstances occur infrequently and that in almost all cases this Agreement constitutes a complete waiver of all appellate rights.

In addition, regardless of the sentence the defendant receives, the defendant also gives up any right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

### C.   Waiver of Attorneys' Fees and Costs

The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-19 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the investigation and prosecution of all charges in the above-captioned matter and of any related allegations, including without limitation any charges to be dismissed pursuant to this plea agreement and any

1  charges previously dismissed).

2  **D.   Impact of Plea on Defendant's Immigration Status**

3  Defendant recognizes that pleading guilty may have consequences with respect to his

4  immigration status if the defendant is not a citizen of the United States.  Under federal law, a broad

5  range of crimes are removable offenses, including offense(s) to which the defendant is pleading guilty.

6  Indeed, because defendant is pleading guilty to Attempting to Provide Material Support and Resources

7  to a Designated Foreign Terrorist Organization, in violation of 18 U.S.C. §§ 2339B(a)(1) and 2, removal

8  is presumptively mandatory.  Removal and other immigration consequences are the subject of a separate

9  proceeding, however, and defendant understands that no one, including his attorney or the district court,

10  can predict to a certainty the effect of his conviction on his immigration status.  Defendant nevertheless

11  affirms that the defendant wants to plead guilty regardless of any immigration consequences that his

12  plea may entail, even if the consequence is his automatic removal from the United States.

13  **VIII.   ENTIRE PLEA AGREEMENT**

14  Other than this plea agreement, no agreement, understanding, promise, or condition between the

15  government and the defendant exists, nor will such agreement, understanding, promise, or condition

16  exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and

17  counsel for the United States.

18  **IX.   APPROVALS AND SIGNATURES**

19  **A.   Defense Counsel**

20  I have read this plea agreement and have discussed it fully with my client.  The plea agreement

21  accurately and completely sets forth the entirety of the agreement.  I concur in my client's decision to

22  plead guilty as set forth in this plea agreement.

23
24  Dated: _5/23/18_

    CHARLES J. LEE
25  Assistant Federal Defender

26

27

28

**B.**     **Defendant**

I have read this plea agreement and carefully reviewed every part of it with my attorney.  I understand it, and I voluntarily agree to it.  Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case.  No other promises or inducements have been made to me, other than those contained in this plea agreement.  In addition, no one has threatened or forced me in any way to enter into this plea agreement.  Finally, I am satisfied with the representation of my attorney in this case.

Dated:   5/23/18

EVERITT AARON JAMESON
Defendant

**C.**     **Attorney for the United States**

I accept and agree to this plea agreement on behalf of the government.

Dated:  5/31/18

McGREGOR W. SCOTT
United States Attorney

By:   DAWRENCE W. RICE, JR.
DAWRENCE W. RICE, JR.
Assistant United States Attorney

**EXHIBIT "A"**
**Factual Basis for Plea**

If this matter proceeded to trial, the United States would establish the following facts beyond a reasonable doubt. The parties agree that these facts establish that the defendant, Everitt Aaron Jameson, attempted to provide material support or resources, including personnel and services, to ISIS.

1.    In and around September 2017, the defendant's Facebook account indicated that the defendant "Liked" and "Loved" posts that were pro-ISIS and pro-terrorism. The defendant's Facebook persona was Everitt Aaron Jameson, vanity "everittj" and his Facebook id # was hidden. For example, Jameson "loved" a post on November 29, 2017 that is an image of Santa Claus standing in New York with a box of dynamite. The text of the post reads, "ISIS post image of Santa with dynamite threatening attack on New York." The image shows Santa Claus standing on a roof next to a box of dynamite looking out over a crowd of shoppers with the words "We meet at Christmas in New York...soon." Under this post, Jameson selected the "Like" option and then selected the "Heart" option to signify that he "Loved" the post.

2.    On October 24, 2017, an FBI Confidential Human Source ("CHS") contacted Jameson via a private message. In this message, the CHS noted that he thought Jameson could be very useful in "darul kufr" and asked Jameson how committed he was to "our cause," Jameson responded that he was committed wholeheartedly to "the cause." "Darul kufr" as used by the CHS, roughly translates to "the land of infidels."

3.    On October 27, 2017, Jameson messaged the CHS stating with, "Salaam Alaykium warmatualAllah wabarakatu, I am here to beg to join the cause against darul kuffar. I'm ready." The CHS replied, "Wa alaykumi as-salam. Patience."

4.    On October 29, 2017, the CHS messaged Jameson, "Are you a revert?" Jameson replied, "Yes. I am. That is what will make me more useful. I can blend in. Or shock and awe." The CHS replied, "When did you say your Shahada. Yes. Allah does things this way!" Jameson responded, "Amin! Allah is the best of planners. I took my Shahada two years ago." The CHS replied "Alhamdulillah! and I see from some of your postings you work for a lift service - so you are not kuffar

police. Again patience. I am at a cafe and need to log off. Have a blessed day." Jameson answered, "I am a tow truck driver. So I can make these services available as well. Sabr. InshAllah we will speak soon again. Salaam Alaykuim warmatulAllah wabarakatu Sister. May Allah reward you for your good work."

5.      In these communications Jameson was establishing his Islamic credentials with the CHS, after which he offered his services as a tow truck driver to the CHS for purposes of supporting "the cause against darul kuffar," meaning terrorist activities directed against infidels.

6.      On October 31, 2017, Jameson posted "Walokiom assalaam rhmatullaha wabarakatu. Yes the will. As today they celebrate Shaytan. A'oodah Billah. The Kuffar will learn the lesson soon enough InshaAllah. And it's ok. I have sabr. I understand. Today is the day the Kuffar are going to revel in sin." Jameson also posted a GIF of a crowd giving a standing ovation to an article discussing the October 31, 2017, terror attack by an ISIS-inspired individual who crashed a rented pickup truck into a group of cyclists and runners, killing 8 people and injuring 11 people in New York City.

7.      On November 2, 2017, Jameson and the CHS had a conversation about the October 31, 2017, terrorist attack. Jameson stated to the CHS, "Allahu Akbar! It says he was one of us. May Allah Grant him Jannah firtuidus Amin". The CHS replied to Jameson by asking the question, "Us?" Jameson responded "Muslim sister. I heard he was uzbek Muslim." To this, the CHS replied, "Yes!" Jameson then responded, "Alhamdulillah. I'm glad to know we Muslims are finally hitting back. Allahu Akbar! The Kuffar deserve everything and more for the lives they have taken."

8.      In making these statements, Jameson was aligning himself with an individual who he believed carried out an ISIS-related attack in the United States. "Jannah firtuidus Amin" is an Islamic term referring to paradise, and Jameson's use of this term reflects that he hopes the perpetrator of the New York City terror attack will be received into paradise.

9.      Consistent with his statements to the CHS, Jameson was in fact a tow truck driver.

10.     On December 11, 2017, an FBI employee ("UCE1") working in an undercover capacity began using a social media platform to communicate with Jameson.

11.     On December 12, 2017, UCE1 messaged Jameson, stating among other things, "We are in desperate times." Jameson responded by stating, among other things, "Cal [sic] on me when I'm

needed.  Anything for Dar al Islam.  Anything for our Ummah."

12.    The following day (December 13), UCE1 engaged in communications with Jameson in which UCE1 explained among other things that "the Sheikhs" wanted to know how Jameson was "able to help" and "to make sure you (Jameson) are ready."  Jameson stated, "Anything.  Tell them anything. I can suit up and take myself to our brothers.  Or whatever they need done here."  Jameson continued, "Alhamdulillah. I know this very well.  I have no doubt.  I am ready.  Give the word and it shall be done."

13.    Thereafter, UCE1 reiterated, "I know you mentioned you will help in anyway is there anything specific you had in mind which you believe would be helpful in this work?  If not it is ok akhi. Allah is the best of planners".  Jameson replied (in substance) "I was a soldier in the Kuffar army before I reverted.  I have been trained in combat and things of war.  In Sha Allah anything of that nature, as well as funding.  Anything for Allah.  He is the best of planners Alhamdulliah.  In Sha Allah, I will be waiting."  UCE1 replied "Indeed.  I will pass this along and by the grace of Allah we will talk soon."  Jameson replied, "Jazak Allah, In Sha Allah we will speak about the same time."

14.    Jameson's reference to "I was a soldier in the Kuffar army" refers to Jameson's prior military experience.  In particular, Jameson's discharge papers from the U.S. Marine Corps (DD-214 and related documents) reflect that in or about June 2009, Jameson attended basic recruit training and graduated several months later.  During this time, Jameson earned a "sharpshooter" rifle qualification. Although Jameson ultimately was discharged from the U.S. Marine Corps for failing to disclose his asthma history, Jameson offered to provide to UCE1 his military experience.

15.    On December 14, 2017, UCE1 messaged Jameson and stated among other things, "I have news for you but I trust you know that what we are talking about and sharing is between you, me and Allah only."  UCE1 continued, "A brother will be contacting you in the next day or so."  Jameson replied " … I will be waiting with anticipation."  UCE1 then inquired with Jameson as to a way for his brother" (associate) to contact Jameson, and Jameson provided the UCE with his (Jameson's) cell phone number, which Jameson confirmed to UCE1 was his only cell phone.  UCE1 then discussed with Jameson instructions for facilitating contact between the UCE1's "brother" (UCE2) and Jameson.

16.    On December 16, 2017, UCE2 sent Jameson a text message on the cell phone number

that Jameson used and had previously provided to UCE1.  UCE2 referred to the instructions UCE1 and Jameson discussed on December 14 and confirmed that UCE2 was contacting Jameson pursuant to the UCE1's instructions, by stating among other things, "I am in the area today if you want to meet let me know."  Jameson confirmed his readiness and availability to meet, replying "InshaAllah, yes.  Where at Akhi?"  UCE2 and Jameson then exchanged additional communications regarding a future meeting.

17.     Eventually, UCE2 and Jameson successfully arranged a meeting.  As he explained his preparation to travel to the meeting, Jameson told the UCE2, " … I'm getting my family's car now. I'm on my way."  Jameson then drove from his residence to the location he previously discussed with UCE2.

18.     On December 16, 2017, Jameson and UCE2 met in UCE2's car.  Jameson sat in the passenger seat of the vehicle, directly in front of UCE2.  Within minutes of entering the vehicle, Jameson expressed that he was willing to do anything for "the cause," meaning ISIS's cause.  Jameson said that he was ready. UCE2 questioned Jameson and asked if Jameson knew who he was meeting with. Jameson acknowledged that he understood and confirmed that he did not disclose the meeting to anyone. UCE2 stated that UCE2 did not want there to be any confusion or doubt and asked Jameson if he knew who Abu Bakr al-Baghdadi was. Jameson stated that he did know, and UCE2 informed Jameson that UCE2's boss was al-Baghdadi.  Jameson responded positively and was pleased that UCE2 was affiliated with ISIS.  Abu Bakr al-Baghdadi is the leader of the foreign terrorist organization the Islamic State of Iraq and al-Sham (ISIS).

19.     During the meeting, UCE2 stated that UCE2 heard that Jameson had something to offer and asked for further clarification. Jameson said that he was an Infantryman and was decently well-versed in the "Anarchist Cookbook" (a reference to a book that is publicly available and discusses among other things the construction of improvised explosives and devices).  UCE2 asked Jameson about his capabilities. Jameson responded that he was a tow truck driver, had the ability to provide money, and was willing to travel to Syria. Jameson volunteered that he got paid twice a month and could provide $400 per month.  On three or four separate occasions, UCE2 encouraged Jameson to go home and think about what he was saying. UCE2 told Jameson he should take time to think about moving forward, but Jameson rebuffed UCE2's requests, maintaining that he was ready and prepared to

proceed.

20.     Jameson stated that "we need something along the lines of New York or San Bernardino." Jameson was referring to the same October 31 terrorist attack in New York discussed above and a shooting-related terrorist attack in San Bernardino in 2015. Jameson identified a possible target location for a new attack, noting that the best place would be a large area such as San Francisco. UCE2 told Jameson that San Bernardino and New York were distinctly different attacks and asked for clarification. Jameson replied that he wanted to use a combination of the two, i.e. by inflicting casualties through the use of a vehicle and firearms.

21.     Jameson specifically named Pier 39 in San Francisco as a target location because he had been there before and knew that it was a heavily crowded area, and that, according to Jameson, no reconnaissance or site survey would be necessary because he was already familiar with the area. Jameson explained that he also desired to use explosives, and described a plan in which explosives could "tunnel" or "funnel" people into a location where Jameson could inflict casualties by shooting people who were escaping from the area where the explosives were detonated. UCE2 asked Jameson about the operational timeline. Jameson replied that he could do it that week (the week of December 18 through December 25, 2017). Jameson also stated that Christmas was the perfect day to commit the attack. When asked by UCE2, Jameson said he did not have and did not need an escape plan because he was ready to die. UCE2 instructed Jameson not to do anything yet, as UCE2 would need to get approval from his bosses, i.e. al-Baghdadi. Jameson acknowledged that he understood.

22.     UCE2 asked Jameson what assistance UCE2 could provide. Jameson stated that he needed ammunition, powder, tubing, and nails. When asked what kind of a weapon he would need, Jameson noted that he would prefer an assault rifle. Jameson also explained that he was trained in both the M-16 and the AK-47 rifle. Jameson also stated that he needed timers and remote detonators for the explosive charges that he previously described to the UCE2. Jameson said that he could get the PVC pipe, nails, and powder.

23.     UCE2 asked Jameson if he could make a video, or write a statement that he could show the "brothers" (meaning other ISIS supporters and members). Jameson stated that he would write a statement, but he would need UCE2's help in doing a video. UCE2 advised that UCE2 would be in

contact and the meeting ended.

24.     Shortly after the meeting concluded, Jameson transmitted a text message to UCE2 confirming "It is written." Jameson further explained that "It is half a page long and by me. It's in my hand, and stated it's me. In Sha Allah it will be what is needed. I will be back late night tomorrow. Around 11pm to Midnight."

25.     Later, on December 18, 2017, UCE2 contacted Jameson and asked if they were meeting that day, and also asked if UCE2 could get pictures of the "trip we are going to take for Xmas". In response, Jameson sent a photograph depicting a map of Pier 39, and three other photographs of and around Pier 39.

26.     Later on December 18, 2017, an FBI employee, using an identifiable telephone number with a Washington, D.C. area code (202) mistakenly called Jameson's cellular telephone. After Jameson answered in apparent Arabic language, the FBI employee immediately terminated the call. Shortly afterwards, Jameson called the 202 telephone number, which resolves to a voice mail identifying the name (but not employing agency) of user of the 202 telephone.

27.     Later during that afternoon (December 18, 2017), UCE2 and Jameson again engaged in communications regarding a follow-up meeting. Among other things, UCE2 asked Jameson whether he could locate and rent a storage unit for use in preparing for their operation. Jameson confirmed that he could and later advised UCE2 that he had possibly located a storage unit.

28.     Later during the evening, UCE2 contacted Jameson to discuss arranging a follow-up meeting. Jameson responded by indicating that he had been "very busy tonight." Moreover, Jameson told UCE2, "I also don't think I can do this after all. I've reconsidered." UCE2 stated, "We only can do Allah's will," and Jameson replied "In Sha Allah one day I can. But I can't."

29.     On December 20, 2017, a search warrant, issued by the United States District Court for the Eastern District of California on December 19, 2017, was executed at Jameson's residence located in Modesto, CA. at 8:04 a.m.

30.     Among the items seized was a white envelope containing handwritten letter signed by Abdallah Abu Everitt Ibn Gordon Al-Amriki dated 12/16/17. This is the letter that Jameson drafted after his meeting with UCE2. That letter reads as follows:

12-16-17

I Abdallah adu Everitt ibn Gordon have committed these acts upon the Kuffar, in the name of Dar al Islam, Allahu AKbar! You all have brought this upon yourselves. There are no innocent Kuffar! Each and every Kuffar in this Nationalistic, Godless society has a hand in this. You've Allowed Donald J Trump to give away Al Quds to the Jews. Both You and he are wrong, it belongs to the Muslemeen. We have penetrated and infiltrated your disgusting country. These Acts will continue until the Lions of Islam overtake you. Turn to Allah, make tawbah and fight with us, the soldiers who fight in the day and the night. Allah SWT is most forgiving, I am not. Long live Isil, Long Live Abu Bakr al-Baghdadi. Allahu Akbar!

Abdallah abu Everitt ibn Gordon al-Amriki

(signature)

31.      During the search of the residence, FBI Agents interviewed Jameson.  At periodic times during the interviews, Jameson stated his support of ISIS and terrorism and discussed aspects of the plan to carry out an attack, noting that he would be happy if an attack was carried out.

A-7