HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
CHARLES J. LEE, CA Bar #221057
REED GRANTHAM, CA Bar #294171
Assistant Federal Defenders
2300 Tulare Street, Suite 330
Fresno, CA  93721-2226
Telephone: 559.487.5561/Fax: 559.487.5950

Attorneys for Defendant
EVERITT AARON JAMESON

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 1:18-cr-00001-LJO |
| Plaintiff, | |
| v. | **NOTICE OF MOTION AND MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A)(I)** |
| EVERITT AARON JAMESON, | |
| Defendant. | |

# TABLE OF CONTENTS

**PAGE(S)**

MOTION..................................................................................................1

    I.     Introduction .................................................................1

    II.    Mr. Jameson Has Met the 'Claims-Processing' Requirement in the Statute as More than 30 days have Lapsed since his Request to the Warden was Made.....................................................3

    III.   The Court Should Reduce Mr. Jameson's Sentence Under § 3582(c)(1)............3

        A.    Mr. Jameson has Extraordinary and Compelling Reasons for Release Because he has Several Chronic Conditions that, Under the CDC's Guidance, Increase his Risk of Severe Illness and Death from COVID-19, Which is Spreading Rapidly Throughout the BOP ...............................................5

            1.    Mr. Jameson's Obesity Increases His Risk from COVID-19...................................................6

            2.    Mr. Jameson has also Been Diagnosed with Major Depressive Disorder, Which Causes Immunodeficiency..........8

            3.    Mr. Jameson's Epilepsy Increases his Risk from COVID-19................................................10

            4.    Mr. Jameson's Asthma Increases his Risk from COVID-19................................................11

                a.    Mr. Jameson has had asthma since childhood ...........11

                b.    Asthma is recognized as increasing an individual's risk for severe illness from COVID-19......................13

        B.    After Careful Consideration of the § 3553(a) Factors, this Court Should Reduce Mr. Jameson's Sentence ...............................16

            1.    The history and characteristics of Everitt Jameson.................16

            2.    The nature and circumstances of the offense, and Mr. Jameson's involvement in the offense ...................21

**TABLE OF CONTENTS (*Cont'd.*)**

3.    Everitt Jameson does not pose a danger to the community, as his conduct in the underlying case was aberrant and out of character, he has been rehabilitated, and release would provide needed treatment in the most effective manner .........23

IV.    Conclusion ....................................................................................27

*Doe v. Barr*
No. 20-CV-02141-LB, 2020 WL 1820667 (N.D. Cal. Apr. 12, 2020)....................................9

*Doe v. Barr*
No. 20-cv-02263 (RMI), 2020 WL 1984266 (N.D. Cal. Apr. 27, 2020)...............................9

*Durel B. v. Decker*
455 F.Supp.3d 99, 2020 WL 1922140 (D. N.J. Apr. 21, 2020)............................................9

*Fraihat v. ICE*
No. 5:19-cv-1546 (JGB) (C.D. Cal. Apr. 20, 2020) ...........................................................9

*United States v. Amarrah*
458 F.Supp.3d 611, 2020 WL 2220008 (E.D. Mich. May 7, 2020) ....................................15

*United States v. Ardila*
3:03-cr-00264-SRU-1, 2020 WL 2097736 (D. Conn. May 1, 2020) ................................8, 15

*United States v. Arreola-Bretado*
19-CR-03410-BTM (S.D. Cal. May 15, 2020)...............................................................4, 5

*United States v. Bandrow*
473 F.Supp.3d 778, 2020 WL 4050242 (E.D. Mich. Jul. 20, 2020)....................................11

*United States v. Barber*
466 F.Supp.3d 1127, 2020 WL 2404679 (D. Or. May 12, 2020)..........................................8

*United States v. Ben-Yhwh*
453 F.Supp.3d 1324, 2020 WL 1874125 (D. Haw. Apr. 13, 2020).....................................15

*United States v. Bertrand*
3:00-cr-00012-LC-1, 2020 WL 2179387 (N.D. Fla. Apr. 29, 2020) ...................................15

*United States v. Brown*
411 F.Supp.3d 446 (S.D. Iowa Oct. 8, 2019).....................................................................4

*United States v. Brown*
457 F.Supp.3d 691, 2020 WL 2091802 (S.D. Iowa Apr. 29, 2020).....................................15

*United States v. Burrill*
17-CR-00491-RS-2 (N.D. Cal. Apr. 10, 2020)..............................................................6, 15

iii

Jameson – Motion for
Compassionate Release

*United States v. Delgado*
457 F.Supp.3d 85, 2020 WL 2464685 (D. Conn. Apr. 30, 2020) ............................................8

*United States v. Dillard*
1:15-cr-170-SAB (D. Idaho Apr. 27, 2020)............................................8

*United States v. Echevarria,*
3:17-cr-00044-MPS-1, 2020 WL 2113604 (May 4, 2020)......................................15

*United States v. Feriz*
Case No. 1:16-cr-00042-LMB (E.D. Va. Dec. 3, 2020)................................................2, 24, 25

*United States v. Firebaugh*
Case No. 1:16CR20341-CR-UU (S.D. Fla. June 1, 2020) ........................................6

*United States v. Foreman*
3:19-cr-00062-VAB-1, 2020 WL 2315908 (D. Conn. May 11, 2020)......................................8

*United States v. Gentille*
2020 WL 1814158 (S.D.N.Y., Apr. 9, 2020).........................................................15

*United States v. Ghorbani*
18-cr-255-PLF (D.D.C. Apr. 3, 2020) ........................................................15

*United States v. Gorai*
2:18-cr-00220-JCM-CWH-1, 2020 WL 1975372 (D. Nev. Apr. 24, 2020)..........................15

*United States v. Halliburton*
Case No. 17-CR-20028, 2020 WL 3100089 (C.D. Ill. June 11, 2020)....................................2

*United States v. Handy*
3:10-cr-00128-RNC-8, 2020 WL 2487371 (D. Conn. May 14, 2020) ....................................8

*United States v. Handy*
PJM 04-0559, 2020 WL 2041666 (D. Md. Apr. 28, 2020) ........................................15

*United States v. Harper*
7:18-cr-00025-EKD-JCH-1, 2020 WL 2046381 (W.D. Va. Apr. 28, 2020)..........................15

*United States v. Hernandez*
451 F.Supp.3d 301, 2020 WL 1684062 (S.D.N.Y., Apr. 2, 2020) ........................................15

Jameson – Motion for
Compassionate Release

**TABLE OF AUTHORITIES (*Cont'd.*)**

**FEDERAL CASES (*cont'd.*)**

PAGE

*United States v. Howard*
4:15-cr-00018-BR-2, 2020 WL 2200855 (E.D. N.C. May 6, 2020)..........................8

*United States v. Hunt*
459 F.Supp.3d 932, 2020 WL 2395222 (E.D. Mich. May 12, 2020) .................................8, 15

*United States v. Jenkins*
460 F.Supp.3d 1121, 2020 WL 2466911 (D. Co. May 8, 2020) ..........................8

*United States v. Johnson*
464 F.Supp.3d 22 (D.D.C. May 16, 2020)..........................9

*United States v. Joling*
466 F.Supp.3d 1141, 2020 WL 1903280 (D. Or. Apr. 17, 2020) ..........................8

*United States v. Lacy*
3:15-cr-30038-SEM-TSH-1, 2020 WL 2093363 (C.D. Ill. May 1, 2020).................................8

*United States v. Lee*
445 F.Supp.3d 272, 2020 WL 2512415 (N.D. Cal., May 15, 2020)........................15

*United States v. McCarthy*
453 F.Supp.3d 520, 2020 WL 1698732 (D. Conn. Apr. 8, 2020) ..........................15

*United States v. Nazario-Montijo*
3:17-cr-00278-JAG (D.P.R. Sep. 17, 2020)..........................2

*United States v. Norris*
No. 3:18-cr-243 (D. Conn., Apr. 16, 2020) ..........................15

*United States v. Park*
1:16-cr-00473-RA-1, 2020 WL 1970603 (S.D. N.Y. Apr. 24, 2020) ..........................15

*United States v. Powell*
No. 1:94-cr-316-ESH, 2020 WL 1698194 (D.D.C. Mar. 28, 2020)..........................15

*United States v. Quintero*
458 F.Supp.3d 130, 2020 WL 2175171 (W.D. N.Y. May 6, 2020) ..........................8

*United States v. Samy*
2:16-cr-20610-AJT-DRG-1, 2020 WL 1888842 (E.D. Mich. Apr. 16, 2020) ..........................15

*United States v. Schram*
475 F.Supp.3d 1168, 2020 WL 4383803 (D. Or. Jul. 31, 2020) ..............................11

*United States v. Simpson*
3:11-cr-00832-SI-3, 2020 WL 2323055 (N.D. Cal. May 11, 2020)..........................15

*United States v. Smith*
454 F.Supp.3d 310, 2020 WL 1849748 (S.D.N.Y. Apr. 13, 2020) ........................15

*United States v. Suarez*
1:18-cr-20175-MGC-1, Dkt. No. 180 (S.D. Fla. Apr. 20, 2020)..........................15

*United States v. Tillman*
1:07-cr-00197-PLM-1, 2020 WL 1950835 (W.D. Mich. Apr. 23, 2020)........................15

*United States v. Tran*
8:08-cr-00197-DOC-1, 2020 WL 1820520 (C.D. Cal. Apr. 10, 2020) ..................15

*United States v. Trent*
3:16-cr-00178-CRB-1, 2020 WL 1812242 (N.D. Cal. Apr. 9, 2020)........................8

*United States v. Ullings*
1:10-cr-00406-MLB-1, 2020 WL 2394096 (N.D. Ga. May 12, 2020)....................8

*United States v. Wen*
454 F.Supp.3d 187, 2020 WL 1845104 (W.D. N.Y. Apr. 13, 2020)....................15

*United States v. Williams*
459 F.Supp.3d 414, 2020 WL 1974372 (D. Conn. Apr. 24, 2020) ..................15

*United States v. Zukerman*
451 F.Supp.3d 329, 2020 WL 1659880 (S.D. N.Y. Apr. 3, 2020) ..................8

*Wise v. United States*
No. CR ELH-18-72, 2020 WL 2614816 (D. Md. May 22, 2020) ..........................6

Jameson – Motion for
Compassionate Release

**TABLE OF AUTHORITIES (*Cont'd.*)**

**FEDERAL STATUTES AND RULES**

**United States Code**

18 U.S.C. § 2339 ..............................................................................................2, 24

18 U.S.C. § 3142 ....................................................................................................16

18 U.S.C. § 3553 ...........................................................................................1, 4, 16, 26

18 U.S.C. § 3582 .............................................................................................. *passim*

28 U.S.C. § 994 .......................................................................................................4

**United States Sentencing Guidelines**

§ 1B1.13 ..............................................................................................................4, 16

**MISCELLANEOUS**

Alvin Powell, Feeling More Anxious and Stressed? You're Not Alone, The Harvard Gazette (Apr. 16, 2020) *available at* https://news.harvard.edu/gazette/story/2020/04/rising-mental-health-concerns-in-the-coronavirus-era/ ..........................................10

Anna North, Coronavirus is Causing a Mental Health Crisis. Here's How to Fight It, Vox (Apr. 16, 2020) available at https://www.vox.com/identities/2020/4/16/21219693/coronavirus-anxiety-depression-mental-health-ptsd-covid ..........................................................................10

BOP, *Covid-19 Cases*, https://www.bop.gov/coronavirus/ .....................................6

CDC, Adult BMI Calculator, available at: https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html ....................................................................................7

CDC, *Coronavirus Disease 2019 (COVID-19):* Phone Advice Line Tool for Possible COVID-19 Patients, (May 22, 2020) (available at: https://www.cdc.gov/coronavirus/2019-ncov/hcp/phone-guide/index.html) ......................................................................11

CDC, People with Certain Medical Conditions, available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#obesity.....................................................................................................................7

Christie Thompson, For Mentally Ill Defendants, Coronavirus Means Few Safe Options, The Marshall Project (May 15, 2020) *available at* https://www.themarshallproject.org/2020/05/15/for-mentally-ill-defendants-coronavirus-means-few-safe-options .............................................................................10

Common Asthma Triggers, CDC (last accessed on Jan. 8, 2021), https://www.cdc.gov/asthma/triggers.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fasthma%2Freduce_triggers.html................................12

Danny Hakim, Asthma Is Absent Among Top Covid-19 Risk Factors, Early Data Shows, N.Y. Times (Apr. 16, 2020), available at https://www.nytimes.com/2020/04/16/health/coronavirus-asthma-risk.html.........................13

Jameson – Motion for
Compassionate Release

David Lat, I spent six days on a ventilator with covid-19. It saved me, but my life is not the same. The Washington Post (Apr. 9, 2020), https://www.washingtonpost.com/opinions/2020/04/09/my-near-death-experience-ventilator/ ...........................................................................................................14

Eur. Respir. J., "Comorbidity and its impact on 1590 patients with COVID-19 in China: a nationwide analysis", May 14, 2020, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7098485/ .......................................5

First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194 (2018) .................................3

Here's the Damage Coronavirus *(COVID-19)* Can Do to Your Lungs, The Cleveland Clinic (Mar. 20, 2020) https://health.clevelandclinic.org/heres-the-damage-coronavirus-covid-19-can-do-to-your-lungs/ ..................................................................................14

Janice K. Kiecolt-Glasera & Ronald Glaserb, Depression and immune function: Central pathways to morbidity and mortality, 53 Journal of Psychosomatic Research 873, 875 (2002), http://pni.osumc.edu/KG%20Publications%20(pdf)/154.pdf .......................9

Lenny Bernstein et al., Coronavirus destroys lungs. But doctors are finding its damage in kidneys, hearts and elsewhere, Wash. Post (Apr. 15, 2020), available at https://www.washingtonpost.com/health/coronavirus-destroys-lungs-but-doctors-are-finding-its-damage-in-kidneys-hearts-and-elsewhere/2020/04/14/7ff71ee0-7db1-11ea-a3ee-13e1ae0a3571_story.html....................................................................13

Ling Mao; Huijuan Jin; Mengdie Wang; et al, Neurologic Manifestations of Hospitalized Patients With Coronavirus Disease 2019 in Wuhan, China, Journal of the American Medical Association, April 10, 2020 (available at: https://jamanetwork.com/journals/jamaneurology/fullarticle/2764549) ..................................11

Lisa Du, Virus Survivors Could Suffer Severe Health Effects For Years, Bloomberg News (May 13, 2020), available at: https://www.thejakartapost.com/life/2020/05/13/virus-survivors-could-suffer-severe-health-effects-for-years.html ..........................................14

Lois Parshley, *The Emerging Long-Term Complications of Covid-19, Explained,* Vox (May 8, 2020) https://www.vox.com/2020/5/8/21251899/coronavirus-long-term-effects-symptoms ............................................................................................................14

Norm Ornstein et al., The Coming Mental-Health Crisis: Congress Must Rethink the American Approach to Mental-Health Care During the Pandemic, The Atlantic (May 14, 2020), https://www.theatlantic.com/ideas/archive/2020/05/coming-mental-health-crisis/611635/ ....................................................................................................10

Northwestern University, COVID-19 threatens the entire nervous system: Neurological symptoms may appear before fever or cough, ScienceDaily, June 11, 2020 (available at: https://www.sciencedaily.com/releases/2020/06/200611152444.htm) ...................................11

Jameson – Motion for
Compassionate Release

4

5
Patient Care & Health Information: Diseases & Conditions: Asthma, Mayo Clinic (May 20, 2020) available at https://www.mayoclinic.org/diseases-conditions/asthma/symptoms-causes/syc-20369653 ..................................................................................................13

6

7
People with Multiple Underlying Conditions, CDC (Dec. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html..........................................................................................................6

8

9
Rush Medical Center Press Release, Asthma Associated with Longer Time on Ventilators for Younger COVID-19 Patients, available at https://www.rush.edu/news/press-releases/asthma-associated-longer-time-ventilators-younger-covid-19-patients ...........15

10

11
Sandee LaMotte, Asthma and Coronavirus: Act Now to Decrease Your Chance of a Serious Outcome, CNN (April 21, 2020), https://www.cnn.com/2020/04/21/health/asthma-coronavirus-wellness/index.html...........................................................................14, 16

12

13
Substantial Investment Needed to Avert Mental Health Crisis, WHO (May 14, 2020), https://www.who.int/news-room/detail/14-05-2020-substantial-investment-needed-to-avert-mental-health-crisis ...................................................................................11

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jameson – Motion for
Compassionate Release

**TO:** **MCGREGOR SCOTT, UNITED STATES ATTORNEY, AND HIS REPRESENTATIVE, ASSISTANT UNITED STATES ATTORNEY CHRISTOPHER BAKER, COUNSEL FOR PLAINTIFF:**

**PLEASE TAKE NOTICE** that on a time and date and courtroom to be determined in the Eastern District of California, Everitt Aaron Jameson, through his attorneys, Assistant Federal Defenders Charles J. Lee and Reed Grantham, will move this Court for a sentence reduction to time served under 18 U.S.C. § 3582(c)(1)(A)(i) and Section 603 of the First Step Act of 2018, P.L. 115-391.

This motion is based on the instant motion and attached memorandum in support of the motion to reduce sentence, the files and records in this case, and any evidence presented before or at the hearing on this motion.

## MOTION

### I.  Introduction

Everitt Aaron Jameson, through his attorneys, moves this Court under 18 U.S.C. § 3582(c)(1)(A)(i) for an order reducing his sentence to time served, based on his health conditions and his difficulty taking care of himself in prison in light of the current health emergency due to COVID-19.  He is currently serving a 180-month term at FCI Sheridan with a scheduled release date of October 3, 2030.  Mr. Jameson has several chronic health conditions documented in his medical records from the Bureau of Prisons ("BOP") as well as from his previous medical providers that make him more vulnerable to COVID-19—obesity, major depressive disorder, epilepsy and asthma coupled with severe allergic reactions causing him respiratory distress.  As Mr. Jameson has been diagnosed with these medical conditions, he is at grave risk within the BOP because there are documented cases of COVID-19 at FCI Sheridan in a setting where social distancing and other preventive measures are not possible to protect an individual from contracting this disease.

Mr. Jameson is in perilous circumstances that satisfy the "extraordinary and compelling reasons" standard under § 3582(c)(1)(A)(i).  After considering the applicable factors set out in § 3553(a), Mr. Jameson respectfully requests that the Court reduce his sentence of imprisonment to time served, i.e., to approximately 38 months.  Mr. Jameson and his family

have a release plan for him to live with his mother and stepfather at their home in Merced, California, and Mr. Jameson can serve a period of home confinement or home detention as a condition of supervised release. Exh. C: Declaration of Kelly Collins, at ¶3.

As documented further below, Mr. Jameson's obesity, major depressive disorder, epilepsy and asthma coupled with his extreme allergic reactions that have required hospitalization in the past, make him especially vulnerable to COVID-19 and heightens his chances of death, severe complications, or lasting health problems, if he contracts the virus. This Court should also grant his compassionate release in order to avoid unwarranted sentencing disparities, as multiple other district courts have found in cases of defendants with obesity, mental health, epilepsy, and asthma and other underlying medical conditions that a reduction is warranted in light of the threat that COVID-19 presents.[1] Moreover, compassionate release has been granted to others convicted of the same charge. *See, e.g.*, *United States v. Ferizi*, Case No. 1:16-cr-00042-LMB, Dkt. No. 105 (E.D. Va. Dec. 3, 2020) (granting compassionate release to defendant convicted of charges including 18 U.S.C. § 2339B, providing material support to a foreign terrorist organization, and sentenced to 240 months where defendant was at high risk for COVID-19 given his chronic cough, asthma, and obesity.)

In view of the conditions in prison during the pandemic, and specifically at the FCI Sheridan complex where Mr. Jameson is housed, as well as in light of Mr. Jameson's particular vulnerabilities, his case demonstrates an "extraordinary and compelling reason" for a sentence reduction.

---

[1] *See, e.g., United States v. Halliburton*, Case No. 17-CR-20028, 2020 WL 3100089 (C.D. Ill. June 11, 2020) (granting compassionate release to a 42-year-old defendant with asthma, obesity, and COVID-19: "based on the currently available scientific data, Defendant continues to be at risk of imminent harm based on his underlying medical conditions); *United States v. Nazario-Montijo*, 3:17-cr-00278-JAG, ECF 273 (D.P.R. Sep. 17, 2020) (granting reduction in sentence to time-served where defendant was sentenced pre-COVID to 24 months pursuant to a binding plea agreement, his self-surrender date extended, and client suffers from obesity and mental health conditions that could be exacerbated by BOP infection mitigation measures).

## II.    Mr. Jameson Has Met the 'Claims-Processing' Requirement in the Statute as More than 30 days have Lapsed since his Request to the Warden was Made

Among the criminal justice reforms implemented by the First Step Act of 2018 ("FSA"), Congress amended § 3582(c)(1) so that the courts will be involved in the sentence reduction process. Specifically, upon a defense-initiated motion, the sentencing judge must now consider reducing a sentence, based on extraordinary and compelling reasons, so long as the defendant has either fully exhausted all administrative remedies, or, there has been a lapse of 30 days from the receipt of such a request by the warden, *whichever is earlier*. 18 U.S.C. § 3582(c)(1)(A).

In this case, on August 21, 2020, Mr. Jameson submitted his request for compassionate release to then Warden Salazar at FCI Sheridan through a completed BP-9 form. Exh. A: Declaration of Everitt Aaron Jameson, at ¶1. Specifically, Mr. Jameson provided his compassionate release BP-9 request, postage prepaid via certified first-class mail addressed to the Warden at FCI Sheridan, to Correctional Officer Carlson, asking him to place it in the outgoing legal mail folder on his behalf. *Id*. The mailing of the compassionate release request on August 21, 2020, and the delivery of the request on August 24, 2020, to FCI Sheridan are reflected in United States postal tracking number 7018 0360 0000 1702 9077. Exh. B: USPS Postal tracking history. To date, neither Mr. Jameson nor undersigned counsel has received any response. Exh. A at ¶2.

Since more than 30 days have lapsed since the receipt of the request by the Warden, Mr. Jameson has met the claims processing rule in the statute. The textual language is clear: either he must exhaust all administrative remedies, or, after 30 days from the receipt of the request by the Warden, the Court may consider his motion. As such, this Court should continue on to consider the merits of this motion.

## III.    The Court Should Reduce Mr. Jameson's Sentence Under § 3582(c)(1)

This Court may grant compassionate release and reduce a previously imposed sentence if "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A). Congress originally delegated the authority to decide what constitutes an extraordinary and compelling reason (as well as other "applicable policy statements")

Jameson – Motion for
Compassionate Release

exclusively to the BOP and the U.S. Sentencing Commission. *Id.*; 28 U.S.C. § 994(t). However, the FSA—which made significant changes to compassionate release law—was enacted on December 21, 2018. *See* Pub. L. 115-391, 132 Stat. 5194, 5239 (2018). The FSA's amendments to § 3582(c)(1)(A) were intended to "increase the use of compassionate release," by entrusting the district court with discretion previously reserved for the director of the BOP. *United States v. Brown*, 411 F.Supp.3d 446, 449 (S.D. Iowa Oct. 8, 2019). The Guidelines manual currently in effect pre-dates the FSA, as it is from November 2018. Thus, the Guidelines' codification of standards for compassionate release "do not address significant changes to this area of law." *United States v. Arreola-Bretado*, 19-CR-03410-BTM, Dkt. No. 41 at 3 (S.D. Cal. May 15, 2020).

The Guidelines may provide some guidance as to when a sentencing reduction is appropriate, keeping in mind that the FSA broadened that guidance "to allow district judges to consider the vast variety of circumstances that may constitute 'extraordinary and compelling.'" *Brown*, 411 F.Supp.3d at 451. The 2018 Guidelines advised granting a sentencing reduction "if, after considering the factors set forth in 18 U.S.C. § 3553(a), . . . the court determines that (1) extraordinary and compelling reasons warrant the reduction; . . . (2) the defendant is not a danger to the safety of any other person or to the community, . . . ; and (3) the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13 (2018).

The "extraordinary and compelling reasons" contained in § 1B1.13 Application Note 1, as relevant to Mr. Jameson's case, include:

- (A) Medical Condition of the Defendant.— . . . (ii) The defendant is— (I) suffering from a serious physical or medical condition, [or] (II) suffering from a serious functional or cognitive impairment . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

- (D) Other Reasons.—. . . [T]here exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

4

**A.** **Mr. Jameson has Extraordinary and Compelling Reasons for Release Because he has Several Chronic Conditions that, Under the CDC's Guidance, Increase his Risk of Severe Illness and Death from COVID-19, Which is Spreading Rapidly Throughout the BOP.**

The current global pandemic and Mr. Jameson's heightened susceptibility to infection within FCI Sheridan, together with his particular vulnerabilities based on his chronic medical conditions, satisfy the Guideline criteria of a "medical condition" and "other reasons" for a sentence reduction. *Id.* As evident from his BOP and previous medical records, Mr. Jameson has several risk factors for COVID-19: obesity, major depressive disorder, epilepsy and asthma. *See* Exh. D: BOP medical records (noting weight on 5/9/19 at 207.0 pounds and prescribing Paroxetine to address major depressive disorder.) at 6, 10; Exh. E: Golden Valley Health Center records (diagnosing "Obesity BMI 30-39.9" on 12/4/2017 at 176 lbs., 12/29/2016 at 205.2 lbs., 11/29/2016 at 200 lbs.) at 1, 2, 5, 8, 9, 19, 20; Exh. F: Dept. of Veterans Affairs medical records (noting "very bad childhood asthma which required multiple admissions" and a severe allergic reaction to a bee string causing anaphylaxis requiring an emergency room/intensive care visit, administration of an EpiPen, albuterol through a nebulizer and inhaler, Prednisone, intravenous steroids and Benadryl, and insertion of an endotracheal tube.) at 26, 62, 124, 127; Exh. I: Mercy Medical Center Merced records (documenting 2015 emergency room visit and that Mr. Jameson has a "history of epilepsy secondary to head trauma, on Depakote, who is here with seizure) at 85. Each of these medical conditions, individually, make Mr. Jameson particularly vulnerable if he should contract COVID-19. But having multiple underlying conditions or "comorbidities" makes him *especially* vulnerable.[2] Indeed, after surveying cases, a district court recently noted, "[d]esignating the particular medical threat posed by COVID-19 and multiple cardiovascular conditions as extraordinary and compelling is consistent with a policy in favor of releasing inmates with serious medical conditions." *Arreola-Bretado*, No. 19-CR-

---

[2] *See People with Multiple Underlying Conditions*, CDC (Dec. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html; *see also* Eur. Respir. J., *"Comorbidity and its impact on 1590 patients with COVID-19 in China: a nationwide analysis"*, May 14, 2020, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7098485/.

Jameson – Motion for
Compassionate Release

And the government has agreed as much in other cases.  On May 18, 2020, the Department of Justice issued internal guidance that directs the government to concede that any defendant who presents any of the CDC high-risk factors can establish "extraordinary and compelling reasons."  *See*, *e.g., United States v. Firebaugh*, Case No. 1:16CR20341-CR-UU, Dkt. No. 43 (S.D. Fla. June 1, 2020); *see also Wise v. United States*, No. CR ELH-18-72, 2020 WL 2614816, at *7 (D. Md. May 22, 2020) ("[J]ust last week, the Department of Justice adopted the position that any inmate who suffers from the chronic conditions associated with severe illness from COVID-19 are eligible for compassionate release.").

In addition, Mr. Jameson is being held at a federal prison that has active COVID-19 cases for both the inmates and staff.[3]  As of January 8, 2021, the BOP website reported 23 inmates positive with Covid-19, 10 staff positive, 35 inmates recovered, and 1 staff recovered. Exh. K: BOP website screenshot on January 8, 2021.

Mr. Jameson will not be able to care for himself in FCI Sheridan in the sense that, not only can he not change the environment that triggers his asthma and has exacerbated his major depressive disorder, he cannot prevent himself from being infected with COVID-19 through social-distancing.  He cannot change the COVID-19 lockdown policies that have taxed his mental and physical health due to the isolation and severely curtailed yard time, contributing to his obesity.  If he is infected, he could die or suffer lifelong health consequences as a result. These circumstances are compelling and extraordinary, warranting a sentence reduction.  Courts nationwide have used § 3582 to grant release to defendants who are at risk due to the rapid spread of COVID-19 in prisons.  *See, e.g.*, *United States v. Burrill*, No. 17-CR-491-RS-2, Dkt. No. 308 (N.D. Cal. Apr. 10, 2020) (collecting cases).  This Court should do the same here.

### 1.   <u>Mr. Jameson's Obesity Increases His Risk from COVID-19.</u>

Mr. Jameson has been medically diagnosed with obesity with a BMI of over 30 since 2016, when he weighed 200 pounds. Exh. E at 19-20.   As documented in Mr. Jameson's

---

[3] BOP, *Covid-19 Cases*, https://www.bop.gov/coronavirus/, last visited January 8, 2021.

medical records, he is five feet, five inches tall.  Exh. E at 5, 8, 19.  His most recent recorded weight measurement at the BOP was 207 pounds on 5/9/19.  Exh. D at 6.  Using that weight measurement, the CDC would calculate Mr. Jameson's BMI at 34.4 and in the "obese" category.[4]

Mr. Jameson has attempted to follow the advice of his health care providers to exercise more and eat better, but during the COVID-19 outbreak and the increasing restrictions the BOP initiated has made those endeavors all but impossible.  On March 23, 2020, FCI Sheridan placed inmates on a 14-day total lockdown, followed by a four-month lockdown period during which inmates were allowed out of their cells for only one hour per day.  Exh. A at ¶3.  Hours outside the cells have been slowly increased since that time, but difficulties remain for inmates to properly exercise, socially distance, and to avoid feelings of isolation and other mental health issues.  *Id*. at 3-5.

Obesity, defined as a BMI of 30 or higher, is among the updated risk factors listed by the CDC for people of any age who are at increased risk for severe illness from COVID-19.[5] Obesity has emerged as one of the most critical risk factors for COVID-19 in the United States.  Indeed, recent research indicates that after age, obesity is the strongest risk factor for hospitalization for people who test positive for COVID-19 and "dozens of studies have reported that many of the sickest COVID-19 patients have been people with obesity."[6]  Based on a recent international team of researchers pooling data from peer-reviewed papers encompassing almost 400,000 patients, the analysis "found that people with obesity who contracted SARS-CoV-2 were 113% more likely than people of healthy weight to land in the hospital, 74% more

---

[4] *See* CDC, *Adult BMI Calculator*, *available at*:
https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html.

[5] *See* CDC, *People with Certain Medical Conditions, available at:*
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#obesity, last visited on Jan. 8, 2021.

[6] Meredith Wadman, *Why COVID-19 is more deadly in people with obesity—even if they're young*, Science (Sept. 8, 2020), available at:   https://www.sciencemag.org/news/2020/09/why-covid-19-more-deadly-people-obesity-even-if-theyre-young.

Jameson – Motion for
Compassionate Release

likely to be admitted to an ICU, and 48% more likely to die." *Id*.

Mr. Jameson's diagnosed obesity with a BMI of over 30 significantly increases his risk of serious illness or death from COVID-19. This factor, in and of itself, is enough to establish an extraordinary and compelling reason for a sentence reduction. Courts around the country have held as much for people who are obese and in facilities with positive cases.[7]

### 2.   Mr. Jameson has also Been Diagnosed with Major Depressive Disorder, Which Causes Immunodeficiency.

Mr. Jameson's diagnosed mental health condition also causes him to be immunocompromised. Mr. Jameson was diagnosed with major depressive disorder in the BOP, and he continues to receive treatment and medication to manage his depression. Exh. D at 10, 25, 45. A growing number of courts are recognizing what research has already established: that depression, PTSD, and anxiety cause immunodeficiency.

First, stress causes immunodeficiency, and people with depression suffer stress under normal circumstances—let alone under circumstances in which that person is confined in a prison that could infect the individual with a deadly disease. As stated in the declaration by Dr. Robert M. Sapolsky, "the longest-recognized pathological consequence of chronic stress (since circa 1930) is suppression of the immune system, worsening of the outcome of immune diseases, and triggering of inflammation. Of critical relevance to COVID-19, this involves impaired immune defenses against viral infection, and compromised function of the lungs."

---

[7] *See, e.g.*, *United States v. Handy*, 3:10-cr-00128-RNC-8, 2020 WL 2487371 (D. Conn. May 14, 2020); *United States v. Barber*, 466 F.Supp.3d 1127, 2020 WL 2404679 (D. Or. May 12, 2020); *United States v. Hunt*, 459 F.Supp.3d 932, 2020 WL 2395222 (E.D. Mich. May 12, 2020); *United States v. Ullings*, 1:10-cr-00406-MLB-1, 2020 WL 2394096 (N.D. Ga. May 12, 2020); *United States v. Foreman*, 3:19-cr-00062-VAB-1, 2020 WL 2315908 (D. Conn. May 11, 2020); *United States v. Jenkins*, 460 F.Supp.3d 1121, 2020 WL 2466911 (D. Co. May 8, 2020); *United States v. Quintero*, 458 F.Supp.3d 130, 2020 WL 2175171 (W.D. N.Y. May 6, 2020); *United States v. Howard*, 4:15-cr-00018-BR-2, 2020 WL 2200855 (E.D. N.C. May 6, 2020); *United States v. Lacy*, 3:15-cr-30038-SEM-TSH-1, 2020 WL 2093363 (C.D. Ill. May 1, 2020); *United States v. Ardila*, 3:03-cr-00264-SRU-1, 2020 WL 2097736 (D. Conn. May 1, 2020); *United States v. Delgado*, 457 F.Supp.3d 85, 2020 WL 2464685 (D. Conn. Apr. 30, 2020); *United States v. Dillard*, 1:15-cr-170-SAB, Dkt. No. 71 (D. Idaho Apr. 27, 2020); *United States v. Joling*, 466 F.Supp.3d 1141, 2020 WL 1903280 (D. Or. Apr. 17, 2020); *United States v. Trent*, 3:16-cr-00178-CRB-1, 2020 WL 1812242 (N.D. Cal. Apr. 9, 2020); *United States v. Zukerman*, 451 F.Supp.3d 329, 2020 WL 1659880 (S.D. N.Y. Apr. 3, 2020).

8

Exh. G: Declaration of Dr. Robert M. Sapolsky, at ¶¶14-15. In particular, the worrisome

confluence of asthma, mental health problems, and a viral respiratory infection is explained in

the declaration by Dr. Sapolsky. *Id.* at ¶17. Additionally, other research demonstrates that

people diagnosed with depression specifically have compromised immunity and immune

dysregulation.[8]

The CDC includes among its high risk categories for COVID-19 "[p]eople who are

immunocompromised" and notes that "[m]any conditions can cause a person to be

immunocompromised."[9] For these reasons, it is no surprise that many courts have found mental

health conditions to be a basis to order release from confinement during this pandemic.[10]

Even if Mr. Jameson's major depressive disorder has currently stabilized—and he is

struggling with his mental health at this time especially with the increased isolation and anxiety

created by fear of contracting COVID-19 and also the related BOP lockdown conditions—his

continued incarceration during the pandemic forebodes future stress and panic attacks, which

cause both immunodeficiency and increased asthmatic symptoms, increasing his risk over the

long course of this pandemic. This is particularly true for Mr. Jameson, who struggled with

isolation when he was first incarcerated at the Fresno County Jail, with the medical staff there

---

[8] *See* Janice K. Kiecolt-Glasera & Ronald Glaserb, *Depression and immune function: Central pathways to morbidity and mortality*, 53 Journal of Psychosomatic Research 873, 875 (2002), http://pni.osumc.edu/KG%20Publications%20(pdf)/154.pdf (describing how depression "directly prompts immune dysregulation," "may lead to subsequent maladaptive immune and endocrine changes," and "may also contribute to prolonged infection or delayed wound healing."); *Stress Weakens the Immune System*, American Psychological Association, https://www.apa.org/research/action/immune (summarizing research concluding that "depression hurts immunity").

[9] *See People of Any Age with Multiple Underlying Conditions, supra*.

[10] *See, e.g., United States v. Johnson*, 464 F.Supp.3d 22 (D.D.C. May 16, 2020) (granting compassionate release due to increased vulnerability to COVID-19 flowing from grievous mental health conditions); *Doe v. Barr*, No. 20-cv-02263 (RMI), 2020 WL 1984266 (N.D. Cal. Apr. 27, 2020) (ordering the release of a foreign national, detained in a county jail awaiting for his removal proceedings, in part because he suffers from PTSD and "[g]rowing evidence demonstrates that PTSD, anxiety/stress, and depression can lead to decreased immune response and increased risk of infections" and thus "compound his susceptibility" to COVID-19"); *Durel B. v. Decker*, 455 F.Supp.4d 99, 2020 WL 1922140 (D. N.J. Apr. 21, 2020); *Fraihat v. ICE*, No. 5:19-cv-1546 (JGB), slip op. at 21 n.20, 22 n.21 (C.D. Cal. Apr. 20, 2020); *Doe v. Barr*, No. 20-CV-02141-LB, 2020 WL 1820667 (N.D. Cal. Apr. 12, 2020).

9

Jameson – Motion for
Compassionate Release

documenting his "anxiety due to being in isolation" and "difficulty being in isolation." Exh. H: Fresno County Jail Corizon medical records, at 4, 8. Those with diagnosed depression face ever-growing mental health concerns as the World Health Organization ("WHO") and other experts warn of an impending mental health crisis related to COVID-19.[11] It comes as no surprise that COVID-19 is having a serious impact on mental health, with people who are not in prison reporting higher incidents of stress, anxiety, and other mental health concerns.[12] While all those with pre-existing mental health conditions may see their symptoms worsen due to stress caused by the pandemic, this is especially true for people who are held in prisons, who now have even less access to mental health support and other resources because of the pandemic, all while the threat of infection looms.[13]

### 3.    Mr. Jameson's Epilepsy Increases his Risk from COVID-19.

Mr. Jameson suffers from epilepsy and has been previously prescribed medications in an effort to control his seizures. Exh. I: Mercy Medical Center records (documenting ER visit due to epileptic seizure on 12/20/15; ER visit for same on 7/22/15; ER visit and hospital admission for same on 7/02/15) at 13, 84-84, 104-05; Exh. D: BOP medical records, Mr. Jameson reporting seizure incident on May 9, 2019) at 2.

Epilepsy is a central nervous system disorder and COVID-19 has been shown to infect

---

[11] *See, e.g., Substantial Investment Needed to Avert Mental Health Crisis*, WHO (May 14, 2020), https://www.who.int/news-room/detail/14-05-2020-substantial-investment-needed-to-avert-mental-health-crisis; Norm Ornstein et al., *The Coming Mental-Health Crisis: Congress Must Rethink the American Approach to Mental-Health Care During the Pandemic*, The Atlantic (May 14, 2020), https://www.theatlantic.com/ideas/archive/2020/05/coming-mental-health-crisis/611635/ (Four in 10 report that worry or stress related to COVID-19 had led to sleep problems. "Others reported that the coronavirus had caused them to experience a variety of health-related ills, such as frequent headaches or stomachaches and increased alcohol or drug use. If these problems are not addressed now, they may fester and worsen in the future.").

[12] *See, e.g.*, Alvin Powell, *Feeling More Anxious and Stressed? You're Not Alone*, The Harvard Gazette (Apr. 16, 2020) *available at* https://news.harvard.edu/gazette/story/2020/04/rising-mental-health-concerns-in-the-coronavirus-era/.

[13] Anna North, *Coronavirus is Causing a Mental Health Crisis. Here's How to Fight It*, Vox (Apr. 16, 2020) *available at* https://www.vox.com/identities/2020/4/16/21219693/coronavirus-anxiety-depression-mental-health-ptsd-covid; Christie Thompson, *For Mentally Ill Defendants, Coronavirus Means Few Safe Options*, The Marshall Project (May 15, 2020) *available at* https://www.themarshallproject.org/2020/05/15/for-mentally-ill-defendants-coronavirus-means-few-safe-options.

the central nervous system in a similar manner to which it affects the respiratory tract.[14] In fact, about half of hospitalized patients have neurological manifestations of COVID-19.[15] The disease may affect the entire nervous system, including the brain. *Id.* The CDC lists epilepsy as a high risk neurological condition for COVID-19 because it is weakens a person's ability to cough."[16] And district courts are beginning to recognize the increased risk from COVID-19 to epileptic individuals. The court granted compassionate release to the defendant in *United States v. Bandrow*, 473 F.Supp.3d 778, 2020 WL 4050242 (E.D. Mich. Jul. 20, 2020), in part, because he had "two medical conditions, asthma and epilepsy, that render him especially susceptible to serious consequences or death if he contracts COVID-19." *Id.* at *1. *See also, United States v. Schram*, 475 F.Supp.3d 1168, 2020 WL 4383803 (D. Or. Jul. 31, 2020) (granting compassionate release based on the defendant's significant health concerns, including epilepsy).

### 4. <u>Mr. Jameson's Asthma Increases his Risk from COVID-19.</u>

#### a. *Mr. Jameson has had asthma since childhood.*

Mr. Jameson had severe asthma as a child and which caused him to be hospitalized a number of times, especially coupled with his severe allergic reactions resulting in anaphylaxis. Exh. J: Sutter Health medical records (documenting "history of pulmonary disease, including asthma, with use of inhaler"; bee sting on 11/2/04 requiring epi-pen injection, albuterol and hospitalization; "Ambulance admit form" to hospital due to "acute asthma attack" on 10/11/04 even when using home nebulizer and on prescription for albuterol; "Ambulance admit form" to hospital due to "Acute [shortness of breath] – exacerbation of asthma" on 1/3/04; ER visit 8/30/02 due to "asthma attack at school" described as "moderate" with albuterol administered

---

[14] *See*, *e.g.*, Ling Mao; Huijuan Jin; Mengdie Wang; et al *Neurologic Manifestations of Hospitalized Patients With Coronavirus Disease 2019 in Wuhan, China*, Journal of the American Medical Association, April 10, 2020 (available at: https://jamanetwork.com/journals/jamaneurology/fullarticle/2764549).

[15] Northwestern University, *COVID-19 threatens the entire nervous system: Neurological symptoms may appear before fever or cough*, ScienceDaily, June 11, 2020 (available at: https://www.sciencedaily.com/releases/2020/06/200611152444.htm).

[16] CDC, *Coronavirus Disease 2019 (COVID-19): Phone Advice Line Tool for Possible COVID-19 Patients*, (May 22, 2020) (available at: https://www.cdc.gov/coronavirus/2019-ncov/hcp/phone-guide/index.html)

by EMS.) at 27, 52, 71-72, 111.  During his time in the U.S. Marines, Mr. Jameson was stung by a bee requiring a multiple day hospitalization with numerous medical treatments and medications.  Exh. F at 26, 62, 124, 127.

Mr. Jameson's respiratory issues are exacerbated by the prison environment, which does not provide the sanitary conditions and proper ventilation for individuals with respiratory problems.  Because of the poor ventilation at FCI Sheridan, Mr. Jameson has been waking up in the middle of the night experiencing asthma symptoms similar to what he suffered as youth e.g. choking sensation, difficulty breathing, etc.  Exh. A at ¶6.  It is Mr. Jameson's understanding the air filters have only been cleaned once during the pandemic and the recirculated air is being shared by other COVID-19 positive inmates.  *Id*. at ¶5.

Mr. Jameson first started using a steroidal inhaler when he was around 2 or 3 years old.  *Id*. at ¶6.  For years, he and his mother have managed his asthma symptoms through sanitation (cleaning the air and rooms of dust and mold) as well as proper ventilation—an open window or clean ventilation system.  In FCI Sheridan, Mr. Jameson has experienced more severe asthmatic symptoms during the pandemic, likely attributable to the dust and other asthma triggers (mold, irritating cleaning products, pests like cockroaches and mice) that are present in the prison.[17] The central ventilation system is of no assistance: if it is on, it kicks up the dust and other substances in the area; if it is off, he has to breathe the unclean air around him.  Of course, Mr. Jameson is unable to clean the entire prison and its ventilation system and believes the air filters have been serviced only once during the pandemic.

In addition, the anxiety Mr. Jameson is experiencing under the threat of infection inside the prison is likely exacerbating his asthma symptoms as of late.  The CDC recognizes that strong emotions, such as anxiety, stress, and panic attacks, can lead to hyperventilation and subsequent asthma attacks.  *Id*.

---

[17] *See Common Asthma Triggers*, CDC (last accessed on Jan. 8, 2021), https://www.cdc.gov/asthma/triggers.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fasthma%2Freduce_triggers.html

### b. Asthma is recognized as increasing an individual's risk for severe illness from COVID-19.

Asthma (moderate or severe) is among the updated risk factors listed by the CDC for people of any age with underlying medical conditions who may be at increased risk for severe illness from COVID-19.[18]  Since the pandemic began, it has been widely known that COVID-19 damages the lungs by "inflaming and clogging the tiny air sacs in the lungs, choking off the body's oxygen supply until it shuts down the organs essential for life."[19]  Although, like much of what is still unknown about COVID-19, "the data analysis on the effects of asthma is in its infancy," health experts cite "an existing body of research that shows the flu and milder coronaviruses exacerbate asthma."[20]  Indeed, "viral infections are the No. 1 cause of asthma flares in both children and adults under normal conditions."  *Id.*

Asthma, by definition, is a lung condition in which the airways in the lungs narrow and swell, making it difficult to breathe.  The swelling can also produce extra mucus, which can make it even more difficult to obtain an adequate oxygen supply.[21]  Dr. Lakiea Wright, a specialist in allergies and immunology, noted, "You can imagine if a virus that causes extra inflammation gets in there, then that's going to be worse… Those are the patients who might end up on ventilators to help with breathing because Covid-19 is doing a lot of damage in the lungs."[22]

---

[18] *See People of Any Age with Underlying Conditions*, CDC (Dec. 29, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

[19] Lenny Bernstein et al., *Coronavirus destroys lungs. But doctors are finding its damage in kidneys, hearts and elsewhere,* Wash. Post (Apr. 15, 2020), available at https://www.washingtonpost.com/health/coronavirus-destroys-lungs-but-doctors-are-finding-its-damage-in-kidneys-hearts-and-elsewhere/2020/04/14/7ff71ee0-7db1-11ea-a3ee-13e1ae0a3571_story.html.

[20] Danny Hakim, *Asthma Is Absent Among Top Covid-19 Risk Factors, Early Data Shows,* N.Y. Times (Apr. 16, 2020), available at https://www.nytimes.com/2020/04/16/health/coronavirus-asthma-risk.html.

[21] *Patient Care & Health Information: Diseases & Conditions: Asthma*, Mayo Clinic (May 20, 2020) *available at* https://www.mayoclinic.org/diseases-conditions/asthma/symptoms-causes/syc-20369653.

[22] Sandee LaMotte, *Asthma and Coronavirus: Act Now to Decrease Your Chance of a Serious Outcome*, CNN (April 21, 2020), https://www.cnn.com/2020/04/21/health/asthma-coronavirus-

Importantly, Rush Medical Center has recently released a study on young people with asthma who contract COVID-19, concluding that these individuals spend a longer amount of time intubated and on a ventilator, when they otherwise would have seemingly fared well with the disease. [23]  Notably, this study *does not differentiate between mild intermittent and moderate to severe asthma*, as the CDC has.  *Id.*  And even healthy, young individuals "who suffered from asthma as a child" and whose adult asthma is "managed well with an inhaler" have very nearly died after contracting COVID-19.[24]

Further, post-infection complications in serious COVID-19 cases (such as when a person is intubated and on a ventilator) include acute respiratory distress syndrome ("ARDS"), a potentially life-threatening lung injury,[25] and lung scarring that can cause "permanent damage."[26]  Thus, even if Mr. Jameson were to survive a potential  COVID-19 infection, his risk of life-long complications from the virus is higher because of his asthma, as it puts him at higher risk of having a serious case and being put on a ventilator, which in turn increases the risk of a lung injury, scarring, and lasting, debilitating effects.[27]

Finally, those with asthma may confuse (or have prison officials confuse) COVID-19 symptoms with asthmatic symptoms, preventing them from obtaining an early diagnosis and

---

wellness/index.html.

[23] Rush Medical Center Press Release, *Asthma Associated with Longer Time on  Ventilators for Younger COVID-19 Patients*, available at https://www.rush.edu/news/press-releases/asthma-associated-longer-time-ventilators-younger-covid-19-patients (last accessed Jan. 8, 2021).

[24] *See* David Lat, *I spent six days on a ventilator with covid-19. It saved me, but my life is not the same.* The Washington Post (Apr. 9, 2020), https://www.washingtonpost.com/opinions/2020/04/09/my-near-death-experience-ventilator/ (author noting he used to run marathons but now "can't walk across a room or up a flight of stairs without getting winded" and "can't go around the block… unless" pushed in a wheelchair).

[25] *Here's the Damage Coronavirus (COVID-19) Can Do to Your Lungs*, The Cleveland Clinic (Mar. 20, 2020) https://health.clevelandclinic.org/heres-the-damage-coronavirus-covid-19-can-do-to-your-lungs/.

[26] Lois Parshley, *The Emerging Long-Term Complications of Covid-19, Explained*, Vox (May 8, 2020) https://www.vox.com/2020/5/8/21251899/coronavirus-long-term-effects-symptoms.

[27] *See* Lisa Du, *Virus Survivors Could Suffer Severe Health Effects For Years*, Bloomberg News (May 13, 2020), available at: https://www.thejakartapost.com/life/2020/05/13/virus-survivors-could-suffer-severe-health-effects-for-years.html, last accessed Jan. 8, 2021.

Jameson – Motion for
Compassionate Release

not knowing they need to seek a different remedy than reaching for their inhaler (one that the BOP so far has denied Mr. Jameson).[28]

For these reasons, courts across the country have found "extraordinary and compelling reasons" warrant release for asthmatics during this pandemic.[29]  This Court should find so here as well.  Mr. Jameson suffers from multiple high-risk factors that could result in severe illness, or death, from COVID-19 under the CDC Guidelines.  Either of these conditions alone, but certainly in combination, and the risks they present constitute "extraordinary and compelling

---

[28] Sandee LaMotte, *Asthma and Coronavirus: Act Now to Decrease Your Chance of a Serious Outcome*, CNN (April 21, 2020), https://www.cnn.com/2020/04/21/health/asthma-coronavirus-wellness/index.html ("Many of the key signs of Covid-19, such as coughing, shortness of breath and chest tightness, are also typical symptoms of asthma. Other potential Covid-19 signs, such as sneezing, runny nose, red eyes and fatigue, can mimic allergy responses.").

[29] *See United States v. Lee*, 455 F.Supp.3d 272, 2020 WL 2512415 (N.D. Cal., May 15, 2020); *United States v. Hunt*, 459 F.Supp.3d 932, 2020 WL 2395222 (E.D. Mich. May 12, 2020); *United States v. Simpson*, 3:11-cr-00832-SI-3, 2020 WL 2323055 (N.D. Cal. May 11, 2020); *United States v. Amarrah*, 458 F.Supp.3d 611, 2020 WL 2220008 (E.D. Mich. May 7, 2020); *United States v. Echevarria*, 3:17-cr-00044-MPS-1, 2020 WL 2113604 (May 4, 2020); *United States v. Ardila*, 3:03-cr-00264-SRU-1, 2020 WL 2097736 (D. Conn. May 1, 2020); *United States v. Brown*, 457 F.Supp.3d 691, 2020 WL 2091802 (S.D. Iowa Apr. 29, 2020); *United States v. Bertrand*, 3:00-cr-00012-LC-1, 2020 WL 2179387 (N.D. Fla. Apr. 29, 2020); *United States v. Handy*, PJM 04-0559, 2020 WL 2041666 (D. Md. Apr. 28, 2020); *United States v. Harper*, 7:18-cr-00025-EKD-JCH-1, 2020 WL 2046381 (W.D. Va. Apr. 28, 2020); *United States v. Williams*, 456 F.Supp.3d 414, 2020 WL 1974372 (D. Conn. Apr. 24, 2020); *United States v. Gorai*, 2:18-cr-00220-JCM-CWH-1, 2020 WL 1975372 (D. Nev. Apr. 24, 2020); *United States v. Park*, 1:16-cr-00473-RA-1, 2020 WL 1970603 (S.D. N.Y. Apr. 24, 2020); *United States v. Tillman*, 1:07-cr-00197-PLM-1, 2020 WL 1950835 (W.D. Mich. Apr. 23, 2020); *United States v. Suarez*, 1:18-cr-20175-MGC-1, Dkt. No. 180 (S.D. Fla. Apr. 20, 2020); *United States v. Norris*, No. 3:18-cr-243, No. 37 (D. Conn., Apr. 16, 2020) (granting reduction where only risk factor identified was asthma: "[Defendant] suffers from asthma and uses an Albuterol inhaler to treat his symptoms. . . . [H]is medical condition and current conditions of confinement constitute extraordinary and compelling reasons to reduce his sentence."); *United States v. Samy*, 2:16-cr-20610-AJT-DRG-1, 2020 WL 1888842 (E.D. Mich. Apr. 16, 2020); *United States v. Wen*, 454 F.Supp.3d 187, 2020 WL 1845104 (W.D. N.Y. Apr. 13, 2020) (granting reduction for 48-year old defendant where only risk factor was history of asthma; noting possible positive case at institution); *United States v. Smith*, 454 F.Supp.3d 310, 2020 WL 1849748 (S.D.N.Y. Apr. 13, 2020); *United States v. Ben-Yhwh*, 453 F.Supp.3d 1324, 2020 WL 1874125 (D. Haw. Apr. 13, 2020); *United States v. Tran*, 8:08-cr-00197-DOC-1, 2020 WL 1820520 (C.D. Cal. Apr. 10, 2020) (granting reduction for defendant serving a 15-year sentence for Hobbs Act robbery and possession of a machine gun where defendant suffered from asthma since childhood and was housed in a facility with an active COVID-19 outbreak); *United States v. Burrill*, 17-CR-00491-RS-2 (N.D. Cal. Apr. 10, 2020); *United States v. Gentille*, 2020 WL 1814158 (S.D.N.Y., Apr. 9, 2020); *United States v. McCarthy*, 453 F.Supp.3d 520, 2020 WL 1698732 (D. Conn. Apr. 8, 2020); *United States v. Ghorbani*, 18-cr-255-PLF (D.D.C. Apr. 3, 2020); *United States v. Hernandez*, 451 F.Supp.3d 301, 2020 WL 1684062, at *3 (S.D.N.Y., Apr. 2, 2020); *United States v. Powell*, No. 1:94-cr-316-ESH, 2020 WL 1698194 (D.D.C. Mar. 28, 2020).

Jameson – Motion for
Compassionate Release

reasons" justifying a sentence reduction to time-served.

**B.      After Careful Consideration of the § 3553(a) Factors, this Court Should Reduce Mr. Jameson's Sentence.**

If the Court determines that there are extraordinary and compelling reasons warranting a reduction, the Court should specifically "consider[] the factors set forth in 18 U.S.C. § 3553(a)." 18 U.S.C. § 3582(c)(1)(A). Section 1B1.13(2) of the Sentencing Guidelines further instructs the Court to determine whether the individual is "a danger to the safety of any other person or to the community," and to consider the provisions of 18 U.S.C. § 3142(g), which largely mirror those set forth in 18 U.S.C. § 3553(a). As part of this analysis, the Court should specifically consider the history and characteristics of the individual and the nature and circumstances of that individual's involvement in the offense. *See* 18 U.S.C. § 3142(g); 18 U.S.C. § 3553(a).

**1.      The history and characteristics of Everitt Jameson**

Everitt Jameson was born on July 16, 1991, to his parents, Gordon Jameson and Kelly Collins. *See* Presentence Investigation Report ("PSR") ¶ 61. As set forth in detail in his PSR, Everitt endured a uniquely traumatic childhood, marred in many respects by various forms of abuse. *See* PSR ¶ 62. At age 7, he recalled first witnessing physical abuse between his parents, but more generally recalls "them constantly fighting and arguing." *Id*. His mother, who was interviewed for the PSR, confirmed the violence in the home and in particular the violence inflicted on her at the hands of Everitt's father. *See* PSR ¶ 75 (noting that Everitt's father "was very abusive" and recalling an instance, among others, where "he ended up giving her a black eye and breaking one of her ribs"). Unfortunately, the physical and emotional abuse between his parents would ultimately extend to Everitt, and his younger sister, Shantel Jameson. *See* PSR ¶¶ 63 (noting that he took "many beatings from both [his] mother and father"), 75. As he recalls it, "his parents began hitting him at a very young age and continued until he got 'too old to beat on'." PSR ¶ 63 (noting that they would hit him with "whatever they could get their hands on"). The trauma associated with witnessing and experiencing such abuse first-hand was further compounded by drug use in the home. *See* PSR ¶ 75.

Jameson – Motion for
Compassionate Release

Perhaps unsurprisingly, Everitt would spend much of his childhood "scared" and doing his best to cope with his environment as best as he could on his own. PSR ¶ 62. While efforts were made when he was a child to provide him with counseling at school, such efforts appear to have been largely ineffective and brief. *Id*. Although he struggled with mental health issues during his childhood and teenage years—no doubt in part due to the nature of what he witnessed and experienced in his childhood—he would only later be diagnosed with various mental health conditions in his early-to-mid twenties. *See* PSR ¶ 87. At that time, he was diagnosed as suffering from "major depressive disorder," "anxiety and depression," as well as "post-traumatic stress disorder." *Id*. Such conditions, while certainly driven by his environment, also appear to have had a genetic component, as family on his mother's side have a reported history of similar mental health issues.

Notwithstanding what Everitt had to confront on a daily basis, as a child he enjoyed typical activities, like reading and sports. *See* PSR ¶ 62. While school had always proved difficult for him, from a young age he dreamed of joining the military. *See* PSR ¶ 66. On July 18, 2008, two days after his seventeenth birthday, and with his mother's consent, Everitt enlisted for an eight-year commitment with the United States Marine Corps. *Id*. As he would later state in paperwork submitted to the United States Marine Corps, he joined the Marine Corps "to serve my country and to give back to my country." When interviewed for the PSR, he noted that he chose to enroll at such a young age because "he always had a dream to be in the military." *Id*. Since Everitt was still a high school student, he remained in high school until he successfully graduated from James C. Enochs High School in Modesto, California on June 5, 2009. *See* PSR ¶ 96.

Following his enlistment and his graduation from high school, Everitt attended and successfully completed Marine Corps boot camp. *See* PSR ¶ 66. Thereafter, he was transferred to the School of Infantry Training Command in Camp Pendleton in San Diego, California. *Id*. While in infantry training, Everitt earned the "National Defense Ribbon award," and was otherwise fulfilling his dream of serving in the U.S. military. *Id*. Unfortunately, his military dream would come crashing down on October 25, 2009, when he was strung by a bee while in

Jameson – Motion for
Compassionate Release

infantry training and suffered a severe asthma attack. *See* PSR ¶ 67. As noted in his medical records, as a result of the bee sting, in combination with his asthmatic condition, Everitt went into anaphylaxis, encountered difficulty breathing, and had to be taken to the emergency room. *See* Exh. F at 26. As a result of this incident, he was discharged from the U.S. Marine Corps on November 3, 2009. *See* PSR ¶ 66. According to the Marine Corps, and as would later be noted in his discharge paperwork, he was discharged for failing to disclose his asthmatic condition which had the potential to put his brothers in arms at risk in a conflict situation.[30] *See* PSR ¶ 67. As Everitt's lifelong dream had been to serve his country through military service, his discharge was "devastat[ing]" to Everitt. *Id*.

Since his dream and career plan from a young age had been to serve in the military, following his discharge, Everitt, then approximately 19 years old, had to rethink his future. As noted in the PSR, Everitt was forced to move back in with his parents. *See* PSR ¶ 68. As it was before he left for the military, "family issues" in the home would again force him out. *Id*. Over the next three to four years, Everitt would live in a state of flux, at times living on his own, and at times returning to live with his parents. *Id*. During this period of time, he would hold various jobs, ranging from work as a locksmith, to work as a forklift operator, to work as a tow truck driver. *See* PSR ¶¶ 102-103. For a period of time, he furthered his education at Modesto Junior College. *See* PSR ¶ 95.

By early 2014, Everitt was 22 years old and still living in a state of flux, seeking stability in his life. Looking for a fresh start and a new environment, it was during this period that he would briefly move out to Las Vegas, Nevada, where he would meet and begin a whirlwind relationship with a woman named Ashley Edenberg. *See* PSR ¶ 69. After an extremely brief and tumultuous courtship, the two were married on April 20, 2014. *Id*. Ashley

---

[30] As set forth in the PSR, at the time of his enlistment he was asked by the recruiter if he had any medical conditions. When Everitt disclosed that he suffered from childhood asthma, but had not suffered an attack for a number of years and believed he had his asthma in remission. The recruiter told him they were only concerned only with current conditions. As a result, Everitt, notwithstanding his verbal disclosure of his asthmatic condition, was permitted to enlist. Everitt's mother, who was present when this exchange with the recruiter occurred, confirmed this during her interview with the probation officer drafting the PSR. *See* PSR ¶¶ 67, 81.

Jameson – Motion for
Compassionate Release

would give birth to the couple's first child, Everitt Jameson, Jr., on December 2, 2014. *Id*. While Everitt welcomed his son and his new life with Ashley, unfortunately, following the birth of their son, Ashley began to deteriorate mentally.

Less than a month later, on December 30, 2014, Everitt would call law enforcement after Ashley attacked him physically in an effort to pull his newborn son from his arms take him to Las Vegas. *See* PSR ¶ 70. During this incident, she pulled a knife on him and threatened to kill him. *Id*. Notably, Everitt never responded physically, and instead left the scene to call law enforcement. *Id*. After he left, Ashley cut her wrist. *Id*. Once law enforcement arrived, she was placed on a psychiatric hold and Everitt obtained a temporary restraining order against her. *Id*. Although this was the first such incident where law enforcement became involved, Everitt has noted similar instances, both before and after this incident, wherein he suffered physical abuse at the hands of Ashley. *See* PSR ¶ 71 (recalling instances where she "tried to run him over with a car, tried to stab him a few times, and hit him with various objects, including a baseball bat").

As a result of the December 30, 2014 incident, Stanislaus County Child and Family Services ("CFS") became involved and Everitt Jr. was removed from the custody of Everitt and Ashley. Over the next several years, Everitt would work to regain custody of Everitt Jr. Pages of records obtained from CFS detail Everitt's engagement in the process, as he attended parenting classes, counseling, and participated in monitored visits with his son. *See* PSR ¶ 95. However, in large part because Everitt was at the same time attempting to salvage his relationship with Ashley, he would ultimately never regain custody of Everitt Jr. CFS records note that by September 29, 2015, while Ashley had given up all efforts to reunify with Everitt Jr., Everitt was still engaged in the process with CFS. Despite the often abusive and tumultuous nature of their relationship, Everitt made the unfortunate decision to remain with Ashley. She would ultimately give birth to the couple's second child, a girl, Eava Jameson, on February 26, 2016. *See* PSR ¶ 69.

Due the ongoing CFS proceedings relating to Everitt Jr., immediately after the birth of Eava, while still at the hospital, CFS officers removed Eava from Everitt and Ashley and placed

19

the newborn Eava in CFS custody and proceedings. Despondent, yet determined, for the next

several months, Everitt would continue to make efforts to reunite with his two children. By

July 2016, Everitt had formally ended his relationship with Ashley, who ultimately would be

convicted and sentenced to state prison in an unrelated matter. *See* PSR ¶ 71. Unfortunately, as

it related to Everitt's efforts to reunite with his children, his decision to formally separate from

Ashley came too late. In September 2016, both Everitt Jr. and Eava were adopted out, and

Everitt lost all custodial rights. *See* PSR ¶ 72.

     To say that Everitt was devastated after losing all rights to his two children would be an

understatement. *Id.* As his mother later recalled, after he ultimately lost custody of his

daughter, Eava, in September 2016, Everitt "was at his worst mental state" and "him losing his

children made him lose his mind." *See* PSR ¶ 79. Elsewhere in the PSR it is noted that "the

failure of the reunification contributed heavily to the defendant developing a history of severe

depression." *See* PSR ¶ 95. Indeed, medical records obtained from the years 2016 and 2017,

immediately prior to the events in this case, diagnosed Everitt as struggling with "major

depressive disorder, single disorder, anxiety and depression, obesity, and medical history of

cannabis use." PSR ¶ 87. A medical report from 2017 diagnosed him with "major depressive

disorder, single episode, viral syndrome, anxiety disorder, and obesity." PSR ¶ 87. Medical

records further reflect that this time period was punctuated by epileptic seizures.

     As a result of the above, by late 2016, early 2017, Everitt was in a vulnerable and

troubled state. His dream of serving in the military had ended abruptly, and had left him

scrambling to imagine a new future for himself. His marriage, which was, like his childhood,

punctuated by domestic violence carried out against him, had ended in the worst way

imaginable. His two young children, the only positives to come out of his relationship with

their mother, had been adopted out and he had formally and definitively lost all hope of ever

obtaining custodial rights. The anxiety and depression that had always played a role in his life

began to get even worse. In the midst of this period of crisis, hopeless and helpless, Everitt

began attending various churches, seeking meaning and connection. By 2016, Everitt had

found a spiritual home in Islam, and had begun attending a mosque in Modesto. However, at

Jameson – Motion for
Compassionate Release

the same time, his mental health issues remained untreated and, upset at the unfortunate events that had befallen him, he found connection with others online.

**2.** **The nature and circumstances of the offense, and Mr. Jameson's involvement in the offense**

It was in this context that Mr. Jameson became involved in the conduct that resulted in the underlying case. Indeed, as noted above, by late 2016, early 2017, Mr. Jameson was 26 years old, struggling with mental health issues, and in a particularly vulnerable and hopeless state, following the permanent loss of both his children to adoption. According to the reports in the case, Mr. Jameson first came to the attention of the Federal Bureau of Investigation ("FBI") in September 2017 after an informant reported him for liking posts on Facebook that "were pro-ISIS and pro-terrorism." PSR ¶ 5. Approximately one month later, on October 24, 2017, a paid FBI informant, posing as a pro-ISIS, pro-terrorism supporter, sent Mr. Jameson a private Facebook message. *See* PSR ¶ 6. Over the course of the next several months, between October and December 2017, the paid FBI informant communicated with Mr. Jameson, inquiring as to what he was willing to do "for the cause." PSR ¶¶ 9-19. At the time, Mr. Jameson was living with his parents and working as a tow-truck driver for a small company in Modesto.

In December 2017, an undercover agent working for the FBI began to contact Mr. Jameson, and began to ask if he was "able to help." PSR ¶ 16. Specifically, the undercover agent, on December 11, 2017, solicited from Mr. Jameson an answer to the question "[i]s there anything specific you had in mind which you believe would be helpful in this work?" PSR ¶ 17. Days later, on December 14, 2017, this undercover agent would tell Mr. Jameson that another individual would be contacting him "in the next day or so." PSR ¶ 19. On December 16, 2017, a second undercover FBI agent contacted Mr. Jameson and asked to meet with him the same day in Modesto. *See* PSR ¶ 20. Mr. Jameson ultimately agreed to meet with the undercover agent, believing that the individual worked with or was somehow associated with ISIS. *See* PSR ¶ 20. During the course of their meeting, the undercover agent would repeatedly attempt to solicit from Mr. Jameson ideas for plans and attacks that he could participate in. *See* PSR ¶¶ 20-23. In response to the questioning from the undercover agent regarding where such

Jameson – Motion for
Compassionate Release

an attack could occur, Mr. Jameson referenced Pier 39 in San Francisco, and when asked what he would need, he noted a list of items that he would need, *but did not have*, including a firearm, and material to construct an explosive device. *See* PSR ¶ 24. At the end of their meeting, the undercover agent asked Mr. Jameson "to make a video or write a statement to show" his support for ISIS. *See* PSR ¶ 25.

After the meeting that Mr. Jameson had with the undercover agent on December 16, 2017, and despite all the talk regarding an attack in San Francisco, Mr. Jameson did not reach back out to the undercover agent. Two days later, on December 18, 2017, the undercover agent, having not heard from him, contacted him and asked him to send him a picture of the place that would be attacked. *See* PSR ¶ 26. Mr. Jameson responded by sending a photo he found online of Pier 39 in San Francisco. *Id*. The undercover agent further asked Mr. Jameson to rent a storage unit to begin plans for the attack. *Id*. However, later that evening, on December 18, 2017, Mr. Jameson texted the undercover agent the following: "*I also don't think I can do this after all. I've reconsidered.*" *Id.*, emphasis added.

From that point on, Mr. Jameson had no further communications with the undercover agent and made no further plans related to what was discussed with the undercover agent. Nonetheless, two days later, on December 20, 2017, federal agents executed a search warrant at his parents' residence. *See* PSR ¶ 27. After speaking with Mr. Jameson at length, agents placed a psychiatric hold on him and he was taken to Doctors Behavioral Health Center in Modesto. On December 22, 2017, Mr. Jameson was arrested and charged in the underlying case. *See* PSR ¶¶ 27, 32.

As set forth above, Mr. Jameson's involvement in the underlying offense began during a particularly difficult period in his life. Having lost everything of value to him, he began finding meaning and connection with individuals online, who likely shared his deep sense of pain and loss. Significantly, Mr. Jameson was never in communication with any real member of ISIS or anyone actually associated with ISIS. As noted above, he was initially contacted by a paid FBI informant, and then later, a series of undercover FBI agents posing as ISIS supporters and/or associates. While Mr. Jameson did agree to meet with an individual he believed could have

been somehow tied to ISIS, he had no plans or ideas until he was asked by the undercover agent to come up with a plan.  Significantly, after the meeting with the undercover agent on December 16, 2017, Mr. Jameson took no further actions.  Two days later, on December 18, 2017, when the undercover agent reached out again, he told the undercover agent that he did not want to be involved, that he reconsidered and did not want to be involved, and he took no further action.

### 3.  Everitt Jameson does not pose a danger to the community, as his conduct in the underlying case was aberrant and out of character, he has been rehabilitated, and release would provide needed treatment in the most effective manner

As set forth in the PSR, prior to the underlying case, Mr. Jameson had only one prior—a 2016 misdemeanor petty theft conviction that was largely the result of his ex-wife's actions.  *See* PSR ¶ 52.  This conviction was ultimately set aside and dismissed a year later, on October 24, 2017.  *Id.*  He otherwise has no history of arrests.  This is likely due to the fact that for much of his life Mr. Jameson was thought of by those around him as a protector of others.  For his part, he did all he could as a young man to shield his younger sister, Shantel, from the physical and emotional abuse he endured as a child.  *See* PSR ¶ 63 (noting that he "was very protective of Shantel while growing up").  This sentiment is further reflected by Mr. Jameson's mother, who recalls how Mr. Jameson, during a difficult time, took on the role of being a parent to Shantel.  *See* PSR ¶ 77.  Mr. Jameson's strong sense of wanting to protect others is also likely why, from an early age, he wished to serve in the military and protect his country.

While he may have lost his way for a period in late 2016 and early 2017, his conduct in this case is entirely at odds with his otherwise caring and compassionate nature.  *See* PSR ¶ 80 (Mr. Jameson described as "a loving, compassionate, caring person who would give the shirt off his back to help anybody at any time").  As such, his decision to like online posts supportive of ISIS and to ultimately engage with an undercover FBI agent relating to his support for ISIS, stand out as aberrant conduct for someone who only six years prior was in the process of completing U.S. Marine Corps boot camp.  In fact, as noted in detail above, at the time he became involved in the conduct in this case, Mr. Jameson was simply in a state of crisis.  His

Jameson – Motion for
Compassionate Release

dream of serving of the military had ended abruptly, his marriage had been tumultuous, abusive, and had likewise ended tragically, and finally, despite his best efforts, he had once and for all lost custody of his two young children.  These stressors likewise served to exacerbate his already existing mental health struggles, and left him searching for meaning and connection.  Notably, and despite his weakened and lost state, Mr. Jameson ultimately walked away from the offer from the undercover agent to actually take part in preparing any kind of attack.  Accordingly, instead of taking active steps to begin planning anything, Mr. Jameson, on December 18, 2017, simply informed the undercover agent that he did not want to be involved any further.  As such, Mr. Jameson took no violent actions in this case and in fact was never actually in touch with anyone associated with ISIS.

Mr. Jameson's relative lack of involvement and lack of action can be contrasted with the acts undertaken by the defendant in *United States v. Ferizi*, Case No. 1:16-cr-00042-LMB, Dkt. No. 105 (E.D. Va. Dec. 3, 2020).  In that case, the defendant, a student, had responded to "a spokesperson for the Islamic State of Iraq and the Levant ("ISIL")" who had put out a call seeking personal identifying information of United States military and government employees.  *Id.* at Dkt. #105 at 1.  In response, the defendant began responding to the ISIL spokesperson by sending that individual screenshots of credit card information for U.S. citizens.  *Id.*  The defendant would later hack into an Arizona-based electronics company's computer servers and obtain personal identifying information of about 100,000 customers.  *Id.* at Dkt. #105 at 2.  The defendant then proceeded to identify approximately 1,300 customer email addresses that ended in ".gov" or ".mil" and provided this information to the his ISIL contact.  *Id.*  Thereafter, ISIL published a list of U.S. government and military employees whose information had been obtained by the defendant and provided to ISIL.  *Id.*  The defendant was ultimately arrested and extradited to the United States.  *Id.*  On June 15, 2016, he pleaded guilty to one count of providing material support to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B, and one count of accessing a protected computer without authorization in violation of 18 U.S.C. § 1030(a)(2)(C).  *Id.*  At sentencing, the district court sentenced the defendant to 240 months.  *Id.*

Jameson – Motion for
Compassionate Release

In August 2020, the defendant filed a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), noting that he was at high risk for COVID-19 given his chronic cough, asthma, and obesity. *Id.* at Dkt. #105 at 3-5. In granting the motion, the district court noted that his "offense did not involve violence" and that "none of the individuals whose information he gave to ISIL suffered physical harm." *Id.* at Dkt. #105 at 7. The district court further referenced the fact that the defendant's involvement in the offense appeared to be driven by "immaturity rather than ideology." *Id.* Lastly, the district court noted that the defendant had "no significant criminal history" prior to the offense. *Id.*

Mr. Jameson, like the defendant in *Ferizi*, is also a young man with no significant criminal history. Like the defendant in *Ferizi*, Mr. Jameson's actions in the offense were largely driven by immaturity and his inability to cope with the unimaginably difficult situation he found himself in late 2016 and 2017. Mr. Jameson is also remorseful for his involvement in this case. Indeed, since his arrest, Mr. Jameson has drastically distanced himself from the extremism that characterized his mindset in late 2016 and 2017. Unlike the defendant in *Ferizi* however, Mr. Jameson never actually engaged with any member of any terrorist organization, and never actually put any individuals in harm's way. Indeed, prior to taking any meaningful action, Mr. Jameson backed away and stated that he wished to not be involved.

As of the date of this filing, Mr. Jameson has served approximately 38 months in custody. Over the course this period of incarceration, Mr. Jameson has had the opportunity to reflect deeply on the circumstances that led him to become involved in the offense. While he remains a Muslim, he has shed the extremist approach to his faith he had briefly adopted in late 2016 and 2017. In fact, there is evidence to suggest that even back in late 2017, Mr. Jameson had already begun the process of distancing himself from such extremist beliefs. In recent months, Mr. Jameson has indicated a willingness and desire to caution others against this kind of extremism and to share his story with those who might benefit from hearing it. Mr. Jameson has also realized the role that his mental health issues may have played in his thinking around the time of the offense. While Mr. Jameson is able to receive limited mental health treatment—counseling and medication—while incarcerated, such issues can be better addressed and

managed in the most effective manner outside of the custodial context.

As set forth above, there are certainly extraordinary and compelling medical reasons warranting a sentence reduction in the instant case. In addition, a thorough and careful consideration of the section 3553(a) factors further support such a reduction. Such factors include Mr. Jameson's age at the time of the offense, his history of mental health issues, as well as his lack of any significant criminal history. Moreover, after considering the unique history and characteristics of Mr. Jameson, and particularly those events that immediately preceded his involvement in this case, including but not limited to, the permanent loss of custodial rights with respect to his two children, it is clear that his involvement in the underlying offense was the result of the terrible and unfortunate circumstances he found himself in at the time, and not reflective of who he is as a person. This is further substantiated by the fact that when ultimately asked to take meaningful steps towards hurting others, he stepped back and chose to disengage. While he has taken full responsibility for his conduct in the case, he has also taken advantage of the last three years to reflect on what brought him to where he was mentally in late 2016, 2017. He has demonstrated remorse for what he has done, and, as evidenced by his desire to caution others about extremism within Islam, he has been rehabilitated. As a result, he does not pose a danger to the community at large, and pursuant to 18 U.S.C. § 3582 as well as 18 U.S.C. § 3553(a), a reduction is warranted in this case.

If granted such a reduction, Mr. Jameson maintains the unwavering support of his family, who has offered to house him and ensure that he complies with any and all conditions of his release. Such conditions would likely include mental health treatment, drug testing, and any and all other conditions that this Court sees fit.

Jameson – Motion for
Compassionate Release

## IV.    Conclusion

For all the reasons above, Mr. Jameson respectfully requests that this Court expedite the consideration of this motion to the greatest extent possible and grant a reduction to time served.

Respectfully submitted,
HEATHER E. WILLIAMS
Federal Defender

DATED: February 3, 2021        By:    /s/ *Charles J. Lee*
CHARLES J. LEE
REED GRANTHAM
Assistant Federal Defenders
Attorneys for Defendant

Jameson – Motion for
Compassionate Release