McGREGOR W. SCOTT
United States Attorney
CHRISTOPHER D. BAKER
Assistant United States Attorney
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 1:18-CR-0001-LJO |
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C § 3582(C)(1)(A) |
| v. | |
| EVERITT AARON JAMESON, | |
| Defendant. | |

### I. INTRODUCTION

In December 2017, Everitt Jameson orchestrated a meeting with a person he believed to be affiliated with a Foreign Terrorist Organization – the Islamic State of Iraq and al-Sham ("ISIS") – who, in fact, was an FBI undercover agent. During that meeting and in the days that followed, Jameson proposed, planned and made preparations to undertake a terrorist attack at Pier 39 in San Francisco, on Christmas Day, during which he intended to kill civilians with explosive devices and direct fire weapons. After the plot was thwarted by law enforcement, Jameson coolly told an FBI agent that if the attack proceeded he would not "feel one ounce of remorse," and if he had a future opportunity to undertake an attack, there was a "good chance" he would. Jameson was arrested, charged, and pleaded guilty in June 2018 to attempting to provide material support to a designated terrorist organization. He was sentenced to 15 years in prison, and as of today, has served approximately 21 percent of that sentence (his projected release date is October 2030).

Jameson now moves for early release on the grounds that he is particularly at risk of suffering serious complications were he to contract the virus that causes COVID-19. But under the compassionate release statute, Jameson is unable to carry his burden of demonstrating an extraordinary and compelling reason for early release – because he already has received the COVID-19 vaccine that significantly has lessened any risk of infection. Jameson's motion fails on this ground alone.

Jameson offers a host of health conditions, including obesity, major depressive disorder, epilepsy and asthma, as the basis for his request for early release. Only one of these conditions – obesity – is recognized by the CDC as a factor that puts a person at increased risk of severe illness from the virus that causes COVID-19. Thus, while he is wrong to assert that he presents "multiple underlying conditions" making him "especially vulnerable" to COVID-19, Jameson's obesity otherwise would be a basis for this court to conclude he has met his burden of demonstrating an extraordinary reason for compassionate release (but for his recent vaccination).

Even if this Court concludes that Jameson's vaccination is not the death knell for his request to be released from prison early, compassionate release should be denied because Jameson continues to be a danger to the community and the balance of sentencing factors demands that he serve the remainder of the below-Guidelines he received.

## II.    FACTUAL BACKGROUND

Jameson came to the FBI's attention in September 2017 when a confidential human source (CHS) provided information about Jameson's social media activity revealing support for ISIS and terrorism. PSR ¶ 5. Among other things, Jameson "liked" and "loved" a Facebook post depicting Santa Clause standing in New York with a box of dynamite, and text reading: "ISIS post image of Santa with dynamite threatening attack on New York." *Id.*

In late-October 2017, Jameson sent a message to the FBI CHS via Facebook in which Jameson stated, "I am here to beg to join the cause against darul kuffar. I'm ready." According to the FBI, "kufr" is a derogatory Islamic term for unbelievers, and the phrase "darul kuffar" refers to the "land of disbelief" and commonly is used by radical Islamists as a label for the United States or western nations. Criminal Complaint ¶ 7 (Case No. 1:17-mj-00225-BAM). In a separate communication with the CHS,

Jameson identified himself as a "revert" – or a western convert to Islam – and explained, "That is what will make me more useful. I can blend in. Or shock and awe." PSR ¶ 8.

On October 31, 2017, Jameson messaged the CHS and stated, "Today is the day the Kuffar are going to revel in sin." Jameson included in his communication an image of a crowd giving a standing ovation to an article discussing the October 31, 2017, terror attack in New York City by an ISIS-inspired individual who crashed a pickup truck into a group of cyclists and runners, killing eight people and injuring 11. PSR ¶ 10.

On December 12, 2017, an FBI undercover employee (UCE) used a social media platform to contact Jameson, telling him, "We are in desperate times." Jameson replied, "Cal [sic] on me when I'm needed. Anything for Dar al Islam. Anything for our Ummah." PSR ¶ 15. The following day, the UCE contacted Jameson and explained that "the Sheikhs" wanted to know how Jameson was "able to help," and asked Jameson to confirm he was "ready." Jameson replied, "Anything. Tell them anything. I can suit up and take myself to our brothers. Or whatever they need done here. … I have no doubt. I am ready. Give the word and it shall be done." *Id.* ¶ 16. When prompted by the UCE to explain further, Jameson stated, "I was a soldier in the Kuffar army before I reverted. I have been trained in combat and things of war. … anything of that nature, as well as funding. Anything for Allah." *Id.* ¶ 17. Jameson's reference to having been a "solider in the Kuffar army" related to his earlier service in the U.S. Marine Corps during which he earned a "sharpshooter" rifle qualification. *Id.* ¶ 18.

At the UCE's request, Jameson provided his cellular telephone number to facilitate a future meeting with a different "brother." On December 16, 2017, a different FBI UCE posing as an ISIS operative texted Jameson to report that he was "in the area today" and available to meet. PSR ¶ 20. Later that day, Jameson followed a series of directional commands provided by the UCE to eventually locate the UCE in his parked vehicle. Criminal Complaint ¶ 27. At approximately 5:50pm, Jameson entered the UCE's vehicle and, within minutes, told the UCE that he was willing to do anything for "the cause." *Id*. The UCE stated that his boss was Abu Baker al-Baghdadi (then the leader of ISIS) and Jameson confirmed that he knew who that was and appeared pleased with the UCE's status. *Id.* ¶ 20.

During the meeting with the UCE, Jameson confirmed that he previously was an infantryman and was well versed in the "Anarchist Cookbook," which is a publicly available book that discusses

among other things the construction of improvised explosive devices. Jameson also confirmed that he had the ability to provide $400 per month and was willing to travel to Syria. PSR ¶ 21. Jameson then explained to the UCE, "We need something along the lines of New York or San Bernardino," referring to the locations of prior terrorist attacks that caused significant casualties in the United States.

Eventually, Jameson named Pier 39 as a target location for a terrorist attack because he had already been there and knew it was a heavily crowded area. PSR ¶ 23. According to Jameson, no reconnaissance or site survey would be necessary because he was familiar with the area. Jameson explained that he also desired to use explosives and described a plan in which explosives could "funnel" people into a location where Jameson could inflict casualties by shooting people who were escaping from the area where the explosives were detonated. Jameson also stated that Christmas was the perfect day to commit the attack. When asked by the UCE, Jameson said he did not have, and did not need, an escape plan because he was ready to die. The UCE instructed Jameson not to do anything yet, as the UCE would need to get approval from his bosses. Jameson acknowledged that he understood. *Id*.

The UCE asked Jameson what assistance the UCE could provide, and Jameson stated that he needed ammunition, powder, tubing, and nails. PSR ¶ 24. Jameson also said he preferred an assault rifle for a weapon, explaining that he was trained in both the M-16 and the AK-47 rifles. Jameson also stated that he needed timers and remote detonators for the explosive charges that he previously described to the UCE. Jameson said that he could build the timed explosive devices in a remote campground in the mountains. Jameson said he would then bring them to his home to store them. *Id*.

The UCE asked Jameson if he could make a video or write a statement to show the "brothers" (meaning other ISIS supporters and members). PSR ¶ 25. Jameson said he would write a statement but would need assistance making a video. The UCE told Jameson he would be in contact, and the meeting ended.

On December 18, 2017, the UCE contacted Jameson, asking if they were meeting that day and requested pictures of the "trip we are going to take for Xmas." Jameson sent a photograph depicting a map of Pier 39 and three other photographs of and around Pier 39. Later that day, the UCE asked Jameson if he could rent a storage locker in preparation for the operation. Jameson confirmed he could and later advised he had possibly located one.

Later that evening, an FBI employee using an identifiable telephone number with a Washington, D.C. area code (202) mistakenly called Jameson's cellular telephone. Criminal Complaint ¶ 35. The FBI employee hung up after Jameson answered with an Arabic greeting, and shortly afterwards, Jameson called the 202-telephone number back, which resolved to a voice mail identifying the name (but not FBI affiliation) of the caller. Thereafter, the UCE contacted Jameson to discuss arranging a follow-up meeting. Jameson responded he had been very busy that night. Jameson further said, "I also don't think I can do this after all. I've reconsidered." The UCE stated, "We only can do Allah's will," and Jameson responded, "In Sha Allah one day I can. But I can't." PSR ¶ 26.

Jameson was arrested on December 20, 2017, pursuant to a criminal complaint charging him with attempting to provide material support to a terrorist organization, in violation of 18 U.S.C. § 2339B. During the execution of a search warrant at Jameson's residence, law enforcement located a handwritten letter signed by Abdallah Abu Everitt Ibn Gordon Al-Amriki (which Jameson admitted writing during a later interview with the FBI). The letter stated:

> I Abdallah adu Everitt ibn Gordon have committed these acts upon the Kuffar, in the name of Dar al Islam, Allhu Akbar! You all have brought this upon yourselves. There are no innocent Kuffar! Each and every Kuffar in this Nationalistic, Godless society has a hand in this. You've allowed Donald J Trump to give away Al Quds to the Jews. Both You and he are wrong, it belongs to the Muslemeen. We have penetrated and infiltrated your disgusting country. These Acts will continue until the Lions of Islam overtake you. Turn to Allah, make tawbah and fight with us, the soldiers who fight in the day and the night. Allah SWT is most forgiving, I am not. Long live Isil, Long Live Abu Bakr al-Baghdadi.
>
> Allahu Akbar!

PSR ¶ 27.

During two separate interviews that day with FBI agents, Jameson acknowledged his support for ISIS and his planning and willingness to undertake an act of terrorism. He admitted trying to join a group that advocates for ISIS. PSR ¶ 30. When agents asked Jameson if he had a plan to hurt himself or anyone else, he responded, "I mean, yeah. I have a plan. I know what I can do easily, but ..." The agents asked if Jameson was going to do it, and Jameson replied he could not tell them yes or no because he did not know, and he did not trust the FBI. Jameson also stated the innocent people who were hurt in Orlando, San Bernardino, and New York were not innocent and were enemies of Islam. Jameson admitted he had offered to commit an attack like "San Bernardino style … but not San Bernardino, more

like a New York City" attack. Jameson said he knew he would be killing himself. When one of the agents asked Jameson if he was still planning to carry out the attack, Jameson replied, "I mean I'm not gonna say no." Id. ¶ 31.

Jameson said ISIS wanted the destruction of the United States, and he supported that. Jameson said he had been thinking about the plan for a while, some of which included explosives, and others were with a weapon. Jameson said he had somewhat of a military background to carry out the plan and had provided someone from ISIS a plan to attack some place. One of the agents asked if ISIS continued to carry out Jameson's plan, would he feel bad. Jameson responded, "Not even in the slightest bit." The agents asked Jameson to tell them about it because they hoped to stop an attack from happening. Jameson responded, "No I, I'm not going to allow it to be stopped if it's going to take place." Jameson said he would not "feel one ounce of remorse" and that he was unwilling to provide any information about the planned attack. He confirmed that if he had the opportunity to do it, he probably would. Jameson went on to say, "If not now then maybe sometime in the future, possibly, I can't really say. I don't know. There's a good chance of it." PSR ¶ 31.

On June 4, 2018, Jameson pleaded guilty to Attempting to Provide Material Support and Resources to a Designated Foreign Terrorist Organization, in violation of 18 U.S.C. §§ 2339B(a)(1) and 2. CR 23. Consistent with the parties' plea agreement entered pursuant to FRCP 11(c)(1)(C), on August 6, 2018, Jameson was sentenced to 15 years in prison and a lifetime term of supervised release. CR 27.

### III.  LEGAL STANDARDS

"'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 825 (2010). Compassionate release is among those limited circumstances. As amended by the First Step Act of 2018, the compassionate release statute authorizes a court, in cases where a defendant satisfies exhaustion requirements, to "reduce the term of imprisonment (and [to] impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section

3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The applicable policy statement appears in U.S.S.G. § 1B1.13.

The inmate bears the burden of establishing the requirements for a sentence reduction by a preponderance of the evidence. *See United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998). *Accord United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue."); *cf. United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016) ("It is the defendant's burden to establish that he warrants a § 3582(c)(2) reduction.").

## IV.     ARGUMENT

### A.     This Court Can Consider Jameson's Motion

The Court may entertain an inmate's request for compassionate release only "after he has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion" on her behalf, or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. 3582(c)(1)(A)(i). Here, Jameson attests that he submitted his request for compassionate release to the warden more than 30 days ago. Accordingly, this Court may consider his motion

### B.     Jameson Fails to Demonstrate that He Is Entitled to Release from His Sentence

Jameson cannot carry his burden of demonstrating that his alleged heightened risk of serious consequences from COVID-19 is an extraordinary and compelling reason for early release – because on January 13, 2021, Jameson received the first dose of the COVID-19 vaccine. Govt. Ex. A at 1.[1] By the time the parties fully brief this motion, Jameson in all likelihood will have received his second dose.

"Defendant's vaccination against COVID-19 precludes the argument that his susceptibility to the disease is 'extraordinary and compelling' for purposes of § 3582(c)(1)(A)." *United States v. Smith*,

---

[1] In connection with the dramatic steps BOP is taking to mitigate the risk that COVID-19 poses to its vulnerable inmates, BOP has administered more than 45,000 doses of the vaccine to staff and inmates. *See* www.bop.gov/coronavirus.

2021 WL 364636, *2 (E.D. Mich. Feb. 3, 2021) (denying motion for compassionate release, even though inmate's medical conditions were recognized by CDC as high risk factors, because "the Moderna vaccine is exceptionally safe and effective, preventing 94.1% of infections in clinical trials*")*.  *Accord, United States v. Beltran*, 2021 WL 398491, *3 (S.D. Tex. Feb. 1, 2021) (same for Pfizer vaccine); *United States v. Ballenger*, 2021 WL 308814, *4 (W.D. Wash. Jan. 29, 2021) (denying motion; "Ballenger's susceptibility to COVID-19 reinfection is also nearly eliminated by vaccination.").

Because Jameson's vaccination significantly reduces his risk of contracting COVID-19 or experiencing complications related to a COVID-19 infection, this Court should deny his motion as he presents no extraordinary or compelling reason for early release.

### C.   Jameson Presents Only a Single COVID-19 Risk Factor That Otherwise Could be Considered an Extraordinary and Compelling Reason

To qualify for compassionate release, the inmate (after satisfying the exhaustion requirements) must (1) demonstrate extraordinary and compelling reasons warranting a sentence reduction, and (2) show that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. Any reduction must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(ii).

The Sentencing Commission's policy statements are binding on courts. *See Dillon v. United States*, 560 U.S. 817, 827 (2010).  The Sentencing Commission's pertinent policy statement appears at U.S.S.G. § 1B1.13. The relevant application note provides that, so long as a defendant "is not a danger to the safety of any other person or to the community," "extraordinary and compelling reasons exist under" any of the following circumstances:

(A) Medical Condition of the Defendant.—

> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
> > (I)  suffering from a serious physical or medical condition,
> > (II)  suffering from a serious functional or cognitive impairment, or
> > (III) experiencing deteriorating physical or mental health because of the aging

        process,

            that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

    (B)  Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

    (C)  Family Circumstances.—

        (i)  The death or incapacitation of the caregiver of the defendant's minor child or minor children.
        (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

    (D)  Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

The Court's authority to grant compassionate release is statutorily limited to cases where the "reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(ii). Thus the Court should only grant compassionate release where an inmate's circumstances fall into one of the categories listed in U.S.S.G. § 1B1.13.[2]

Because the First Step Act, in at least some cases, allows a court to consider a motion for compassionate release without the benefit of BOP's assessment, a court may grant compassionate release not only on grounds specified by the Sentencing Commission, but also those set forth in the relevant BOP regulation. BOP has issued a regulation defining its own consideration of requests for compassionate release, which are limited to the same bases identified by the Sentencing Commission: medical condition, age, and family circumstances.[3]  The BOP completes a diligent and thorough review, with considerable expertise concerning both the inmate and the conditions of confinement. Its assessment will always be of value.

Thus, the grounds for compassionate release are limited to those listed in Application Note 1 to §

---

[2] Jameson invokes only § 1B1.13 to support his motion (*see* Motion at 4), so the Court need not decide in this case whether courts are limited to § 1B1.13 after the passage of the First Step Act.  *See, e.g. United States v. Brooker*, 976 F.3d 228, 230 (2d Cir. 2020), *but see United States v. Markillie*, 834 Fed. Appx. 395 (9th Cir. 2021) (declining to reach the question).

[3] *See* https://www.bop.gov/policy/progstat/5050_050_EN.pdf.

UNITED STATES' OPPOSITION TO DEFENDANT'S
MOTION FOR COMPASSIONATE RELEASE

9

1B1.13, and any identified by BOP. *See, e.g., United States v. Pinson*, __ Fed. App'x __, 2020 WL 7053771, *3 n.5 (10th Cir. Dec. 2, 2020) ("while Pinson argued in the district court that the policy statement no longer binds federal courts, we have continued to refer to it in deciding challenges related to § 3582(c)(1)."). *Cf, United States v. Dvorak*, 830 Fed. Appx. 846 (9th Cir. 2020) (unpub.) (citing § 1B1.13 as relevant authority in this context).[4]

Here, Jameson offers a host of health conditions, including obesity, major depressive disorder, epilepsy and asthma, as the basis for his request for early release. Only one of these conditions – obesity – is recognized by the CDC as a factor that puts a person at increased risk of severe illness from the virus that causes COVID-19. As this Court has recognized, "[c]hronic conditions that can be managed in prison are not a sufficient basis for compassionate release." *United States v. Ayon-Nunez*, Case No. 1:16-cr-0030-DAD, 2020 WL 704785, *3 (E.D. Cal. Feb. 12, 2020) (citation omitted). Thus, as described in more detail below, while Jameson is wrong to assert that he presents "multiple underlying conditions" making him "especially vulnerable" to COVID-19, Jameson's obesity otherwise would be a basis for this court to conclude he has met his burden of demonstrating an extraordinary and compelling reason for compassionate release (but for his vaccination against the virus).[5]

        *1.  Major Depressive Disorder is Not a Proper Ground for Compassionate Release*

While the CDC indicates that some forms of immunocompromising conditions may or might increase one's risk of severe illness related to COVID-19, it did not include mental health conditions – including depressive order – among those conditions deemed to increase the severity of COVID-19 effects. And courts likewise have concluded that depressive disorder does not constitute an extraordinary circumstance warranting early release. *E.g, United States v. Carter*, 469 F. Supp.3d 583, 590 (S.D. W. Va. 2020) (rejecting depressive order as a basis for compassionate release); *United States*

---

[4] *Accord, United States v. Bell,* 823 F. App'x 283, 284 (5th Cir. 2020); *United States v. Doe,* 833 Fed. App'x 366, 367 & n.2 (3rd Cir. 2020) (per curiagm); *United States v. Monaco,* 832 Fed. App'x 626, 628-29 (11th Cir. 2020).

[5] Although Jameson claims a BMI of 34.4, that is based in part on a height measurement taken in November 2016 of 5 feet, 5 inches. Motion at 7. But both the PSR (at p.3) and more recent BOP medical records reflect that Jameson in fact is 5 feet, 7 inches tall, which would result in a reduced BMI of 32.4, or just above the CDC's threshold of 30.0 to qualify as obese, and well below the threshold of 40.0 to qualify for severe obesity. Govt. Ex. A at 1.

*v. Wragg*, 2020 WL 4015204, *8 (E.D. Pa. July 16, 2020) (same); *United States v. Anderson*, 2020 WL 2838797, *2 (N.D. Cal. June 1, 2020) (same). *Cf. United States v. Busby*, 2020 WL 3883652, *3 (D. Nev. July 8, 2020) ("Given how speculative the relationship is between mental illness and the body's ability to fight COVID-19, the Court does not find that the relationship is an extraordinary and compelling reason for Defendant's release."); *United States v. Poncedeleon*, 2020 WL 3316107, *2 (W.D.N.Y. June 18, 2020) (denying compassionate release, in part, because inmate's medical condition, which included bipolar disorder, anxiety, and depression, "are not believed to present a higher risk of complications").

      Jameson proffers the declaration of a neuroendocrinologist to support his claim that major depressive disorder increases the likelihood that he would suffer more serious effects from COVID-19 were he to contract the virus. But the author of the declaration expressly disclaims any evidence of a link between mental health and COVID-19 (Def. Ex. D at ¶ 11). While the declaration demonstrates that there is a link between anxiety and stress on a person's immune system, it does not establish that Jameson's mental health history renders him immunosuppressed to the extent that he is at risk of severe illness from COVID-19, particularly given that the CDC has not identified mental health as a COVID-19 risk factor.

      Moreover, Jameson's BOP health records establish that his mental health conditions do not "substantially diminish" his ability "to provide self-care," and thus, he cannot meet the strictures of U.S.S.G. § 1B1.13 App. Note 1(A). In particular, Jameson concedes that BOP has been responsive and provided him appropriate treatment and medications to treat his depression (Motion at 8). Thus, for instance, Jameson visited BOP medical staff on November 18, 2018, and reported that his depression symptoms were well controlled while taking Zoloft, and that he had no complaints and experienced no side effects. Govt. Ex. A at 2. Several months later, on March 25, 2019, when Jameson reported to medical staff experiencing increased anxiety and worry, staff discussed options and agreed to change Jameson's prescription medications. Def. Ex. D at 10. The medical staff educated Jameson that he must allow several weeks for medications to reach effective levels, and instructed him to report to the nearest staff member if his symptoms worsened. *Id*. Jameson's BOP medical records do not reflect that Jameson reported any additional mental health complaints to BOP medical staff following this encounter

in March 2019.  In April 2020 and November 2020, Jameson received medication refills but reported no adverse mental health conditions.  Govt. Ex. A at 4-5.

Moreover, on January 21, 2021, Jameson applied for and was accepted into BOP's "Resolve Psychology Treatment Program."  Govt. Ex. A at 6-7.  The Resolve Program is a cognitive-behavioral program designed to address the trauma related mental health needs of inmates. Specifically, the program seeks to decrease the incidence of trauma related psychological disorders and improve inmates' level of functioning.  In addition, the program aims to increase the effectiveness of other treatments, such as drug treatment and healthcare.[6]

Accordingly, Jameson's proffered mental health conditions are not a basis to grant early release.

### 2. *Epilepsy is Not a Proper Ground for Compassionate Release*

The CDC does not recognize epilepsy as a COVID-19 risk factor, and indeed, "there is no evidence that epilepsy increases the risk of COVID-19 infection or increases the severity of infection if exposed."  *United States v. Williams*, 2020 WL 5258480, *4 (E.D. La. Sept. 3, 2020) (collecting cases).  *Accord*, *United States v. Cornish*, 2020 WL 6870575, *1 (E.D. Pa. Nov. 23, 2020) ("Based upon the available data, the Epilepsy Foundation has concluded that by itself, epilepsy (1) does not increase the risk of getting COVID-19; and (2) does not increase the severity of COVID-19.") (citing cases).  The two cases on which Jameson relies for the proposition that epilepsy is a risk factor are inapposite because the defendants in those two cases presented additional, more serious health conditions besides epilepsy warranting early release.  Motion at 11 (*citing Bandrow*, where the BOP issued defendant a "serious illness/critical illness" notice for diagnosed hematuria and the BOP facility – which boasted at the time the second highest COVID-19 mortality rate in the BOP – was incapable of providing medical care; and *Schram*, involving a 68-year old inmate with history of liver disease).

### 3. *Asthma is Not a Proper Ground for Compassionate Release*

On June 25, 2020, the CDC issued revised guidance that downgraded the COVID-19-related risk associated with asthma.  According to the CDC, having moderate-to-severe asthma *might* increase one's risk for severe illness from COVID-19, but the data is inconclusive.

---

[6] *See* https://www.bop.gov/inmates/custody_and_care/docs/20170518_BOPNationalProgram Catalog.pdf.

After publication of the revised CDC guidance, courts have found that asthma does not warrant compassionate release where the petitioner fails to establish that the BOP is incapable of caring for asthmatic inmates. *E.g., United States v. Harris*, 2020 WL 7122430, *5-8 (D. Kan. Dec 4, 2020) (surveying cases); *United States v. Pomales*, 2020 WL 4677596, *2 (S.D.N.Y. Aug. 12, 2020). Here, although he asserts that his "respiratory issues are exacerbated by the prison environment" (Motion at 12), Jameson offers no evidence to suggest he either has experienced any asthma-related event since his discharge from the U.S. Marine Corps in 2009, or that he ever has complained about asthma while in BOP custody, or that BOP is incapable of dealing with asthma in the event Jameson suffers adverse asthma events in the future. *E.g., United States v. Moye*, 2020 WL 6273905, *2 (S.D.N.Y. Oct. 26, 2020) (denying motion; "Defendant, however, makes no specific allegations about his experience at USP Coleman that would lead to the conclusion that his circumstances [with asthma] at this facility give rise to extraordinary and compelling reasons for release.").

Instead, Jameson cites in his motion 26 cases where courts concluded that an inmate's particular asthmatic experience presented extraordinary and compelling reasons warranting early release (Motion at 15, n.29) – but all of those cases predate the CDC's issuance of its most recent guidance concerning asthma, in which the CDC notes the existence of "mixed evidence" about the relationship between asthma and severe illness from COVID-19. *See Harris*, 2020 WL 7122430 at *5.

### D. Even If Jameson Otherwise Was Eligible, the 18 U.S.C. § 3553(a) Factors Do Not Support a Shorter Sentence, and He Remains a Continuing Danger

Any compassionate release decision, even for a statutorily-eligible defendant, must be "consistent with consideration of the sentencing factors set forth at 18 U.S.C. § 3553(a)." *United States v. Hernandez*, No. 1:18-cr-00152-DAD-BAM, 2020 WL 5797896, *7 (E.D. Cal. Sept. 29, 2020). *E.g., United States v. Chavez-Zarate*, No. CR 1:98-05149-NONE, 2020 WL 5095936, at *11 (E.D. Cal. Aug. 28, 2020) (denying compassionate release based on § 3553(a) factors in spite of finding extraordinary and compelling reasons for release); *United States v. Gean*, No. CR 1:17-00179-DAD-BAM, 2020 WL 5366301, at *9 (E.D. Cal. Sept. 8, 2020) (same).

Though Jameson understandably limits his § 3553(a) analysis only to those factors he argues favor release – including his upbringing, lack of criminal history and early family life (Motion at 16-21)

– he does not acknowledge or grapple with the undeniable seriousness and dangerousness of his criminal conduct, and if anything, seemingly minimizes the active role he took in plotting a terrorist attack, suggesting in passing that he was baited in his actions by a paid FBI informant.  Motion at 21-23.[7]  His gloss on the facts is contrary to reality.  *See supra* pp. 2-6.  Jameson (1) discussed and made preparations with a perceived ISIS operative to maim civilians at a renowned tourist attraction, (2) acknowledged his intent to undertake a suicide attack and wrote a martyr letter affirming his devotion to the leader of ISIS, (3) unapologetically refused to assist the FBI in preventing any such attack that could have been set in motion by his actions, saying he would have not "one ounce of remorse" if such an attack was successful, and (4) after being arrested, proclaimed there was a "good chance" he would undertake an attack in the future.  *E.g., United States v. Schuett*, 2020 WL 1677080, at *1 n.7 (D. Nev. Apr. 6, 2020) (explaining "the nature of [the defendant's] underlying crime (making bomb threats against judges in this courthouse) make him a poor candidate for compassionate release").[8]

Factors besides the seriousness of the offense also weigh against compassionate release here.  First, the nature of Jameson's health conditions – both his moderate obesity and the other conditions he presents which the CDC does not recognize as COVID-19 risk factors – does not shift the 3553(a) balance in his favor, particularly given that the magnitude of the risk that COVID-19 poses to an obese person depends on the extent of the individual's obesity.  *United States v. Shah*, 2020 WL 3578103, *2 (S.D.N.Y. June 30, 2020).  Second, given that Jameson has served just 21% of the sentence imposed – a

---

[7] Jameson is correct in asserting that the UCE "repeatedly" attempted to elicit from Jameson whether he had made any detailed plans for undertaking a terrorist attack – to discern whether Jameson merely was puffing.  Motion at 21.  In his motion, Jameson neglects to recount that the UCE also repeatedly "encouraged Jameson to go home and think about what he was saying" and that "he should take time to think about moving forward," but Jameson rebuffed the UCE's requests, maintaining that he was ready and prepared to proceed.  PSR ¶ 21.

[8] For similar reasons, compassionate release is not appropriate because Jameson cannot satisfy his additional burden of demonstrating that he is not "a danger to the safety of any other person or to the community" as provided in 18 U.S.C. § 3142(g)."  *United States v. Arceneaux*, 830 Fed. Appx. 859 (9th Cir. 2020); *Hernandez*, 2020 WL 5797896 at *3 n.3 (quoting U.S.S.G. § 1B1.13(2)).  In particular: "Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."  *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003).

sentence that was 25% less than the 20-year sentence recommended by the Probation Office – a further reduction would not adequately reflect the seriousness of Jameson's criminal conduct, promote respect for the law, provide just punishment or afford adequate deterrence.  *See Gean*, 2020 WL 5366301 at *7 (E.D. Cal. Sept. 8, 2020) (fact that defendant had served only approximately 20 percent of mandatory-minimum sentence weighed against early release).  And third, whereas FCI Sheridan had 35 COVID-19 positive inmates and staff on January 8, 2021 (Motion at 6), as of February 16, 2021 (almost six weeks later), the infection rate has dropped to 12 cases.  *See United States v. Esparza*, No. 1:16-cr-00122-DAD, 2020 WL 4805055, *5 (E.D. Cal. Aug. 18, 2020) (reduction in cases at BOP facility from 24 to 1 weighed against release); *United States v. Parker*, 2020 WL 4018924, *2 (D. Nev. July 16, 2020) ("Terminal Island was one of the first federal prisons to suffer an outbreak, [but] there are currently only six active cases of infected inmates at Terminal Island, the BOP has implemented a detailed COVID-19 response plan for federal inmates, and the reported numbers at Terminal Island suggest that the plan is effective.").[9]

### V.     CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny Jameson's motion for a time-served sentence.

Dated:  February 17, 2021

McGREGOR W. SCOTT
United States Attorney

By:  /s/ CHRISTOPHER D. BAKER
CHRISTOPHER D. BAKER
Assistant United States Attorney

---

[9] Should the Court be inclined to grant Jameson's motion, the government requests a 14-day quarantine and medical clearance prior to release to minimize the possibility of any spread of COVID-19 from the inmate to the public.