UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>EVERITT AARON JAMESON,<br><br>Defendant. | No. 1:18-cr-00001-NONE<br><br>ORDER DENYING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE<br><br>(Doc. No. 29) |

Pending before the court is defendant Everitt Aaron Jameson's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). The motion is based on defendant's medical condition and the risks allegedly posed to him by the ongoing coronavirus ("COVID-19") outbreak. (Doc. No. 29.) For the reasons explained below, defendant's motion will be denied.

**BACKGROUND**

On January 4, 2018, defendant Jameson was charged by way of an indictment with two counts: attempting to provide material support and resources to a designated foreign terrorist organization in violation of 18 U.S.C. §§ 2339B(a)(1) and 2 ("Count One") and distribution of information relating to destructive devices in violation of 18 U.S.C. § 842(p)(2)(A) ("Count Two"). (Doc. No. 14.) Between September and December 2017, the Federal Bureau of Investigation ("FBI") learned that defendant was plotting a terrorist attack at a popular tourist

location in San Francisco, California on Christmas Day in 2017 in furtherance of the Islamic State of Iraq and al-Sham ("ISIS").  (Doc. No. 26 (Presentence Report, "PSR") at 5–11.)  After his terrorist plot was thwarted, defendant made troubling remarks to FBI agents and other law enforcement officials, including stating that he would not feel any remorse if ISIS successfully carried out his terrorist attack, that there was "a good chance" that he would carry out his terrorist attack in the future if given the opportunity, and that he was "okay" with providing a foreign terrorist organization a plan that would "kill a bunch of people."  (*Id.* at 10–11.)

On June 4, 2018, pursuant to the parties' written plea agreement, defendant entered his plea of guilty as to Count One of the indictment.  (Doc. Nos. 22 at 5–6; 23.)  In his plea agreement, defendant acknowledged that a sentence of 15 years imprisonment for his crime "would be reasonable and appropriate[.]"  (Doc. No. 22 at 7.)  After defendant Jameson entered his guilty plea, it was determined by the U.S. Probation Office that under the U.S. Sentencing Guidelines his adjusted offense level was 37 and because his offense of conviction was a federal crime of terrorism he was automatically in a category VI criminal history.  (PSR at 14, 25.)  Given these determinations, the advisory sentencing guideline range would have called for a term of imprisonment of between 360 months and life, but because the offense to which the defendant entered his plea of guilty carried with it a 20-year statutory maximum penalty, the applicable range called for a 20-year term of imprisonment.  (*Id*. at 25.)  The U.S. Probation Office recommended a sentence of 240 months in prison.  (*Id.*)  On August 6, 2018, the court followed the recommendation of the parties embodied in the plea agreement and sentenced defendant to 180 months in prison with a life term of supervised release to follow and imposed the mandatory special assessment of $100.  (Doc. Nos. 27; 28 at 2–3, 6.)

Defendant is currently serving his sentence at the U.S. Bureau of Prisons' ("BOP") Sheridan Federal Correctional Institution in Sheridan, Oregon ("FCI Sheridan") with a projected release date of October 3, 2030.  *See Find an inmate*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Apr. 14, 2021).  On February 3, 2021, defendant filed the pending motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).  (Doc.

/////

2

No. 29.)  On February 17, 2021, the government filed its opposition to the motion, and on February 23, 2021, defendant filed his reply thereto.  (Doc. Nos. 37, 43.)

## LEGAL STANDARD

A court generally "may not modify a term of imprisonment once it has been imposed."  18 U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances.").  Those limited circumstances include compassionate release in extraordinary cases.  *See United States v. Holden*, 452 F. Supp. 3d 964, 968 (D. Or. 2020).  Prior to the enactment of the First Step Act of 2018 ("the FSA"), motions for compassionate release could only be filed by the BOP.  18 U.S.C. § 3582(c)(1)(A) (2002).  Under the FSA, however, imprisoned defendants may now bring their own motions for compassionate release in the district court.  18 U.S.C. § 3582(c)(1)(A) (2018).  In this regard, the FSA specifically provides that a court may

> upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf[1] or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that –
>
> (i)  extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made

---

[1] If the BOP denies a defendant's request within 30 days of receipt of such a request, the defendant must appeal that denial to the BOP's "Regional Director within 20 calendar days of the date the Warden signed the response."  28 C.F.R. § 542.15(a).  If the Regional Director denies a defendant's administrative appeal, the defendant must appeal again to the BOP's "General Counsel within 30 calendar days of the date the Regional Director signed."  *Id.*  "Appeal to the General Counsel is the final administrative appeal."  *Id.*  When the final administrative appeal is resolved, a defendant has "fully exhausted all administrative rights."  *See* 18 U.S.C. § 3582(c)(1)(A).

     by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

     and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission [.]

18 U.S.C. § 3582(c)(1)(A)(i) and (ii).[2]

   The policy statement with respect to compassionate release in the U.S. Sentencing Guidelines sets out criteria and circumstances describing "extraordinary and compelling reasons." U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 1B1.13[3]; *see also United States v. Gonzalez*, 451 F. Supp. 3d 1194, 1197 (E.D. Wash. 2020) (noting that courts "universally" rely on U.S.S.G. § 1B1.13 to define "extraordinary and compelling reasons," even though that policy statement was issued before Congress passed the FSA and authorized defendants to file compassionate

---

[2] Under 18 U.S.C. § 3624(c)(2), the BOP may release an incarcerated defendant to home confinement "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." The Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act"), Pub. L. 116-136, expands the BOP's authority to release incarcerated defendants without judicial intervention. The CARES Act allows the BOP to "lengthen the maximum amount of time" for which a prisoner may be placed in home confinement under § 3624(c)(2) "as the Director determines appropriate," assuming "the Attorney General finds that emergency conditions will materially affect the functioning" of the BOP. CARES Act, Pub. L. 116-136, Div. B, Title II, § 12003(b)(2) (2020). However, the BOP's authority in this regard is limited to "the covered emergency period." *Id.* The BOP's authority expires "30 days after the date on which the national emergency declaration terminates." *Id.* § 12003(a)(2). After the CARES Act was enacted, the Attorney General issued a memo instructing the BOP to "immediately review all inmates who have COVID-19 risk factors" beginning with those who are housed at facilities where "COVID-19 is materially affecting operations." Office of Att'y Gen., *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020). The BOP has acted on the Attorney General's guidance, including one case in which a sentenced prisoner was released to home confinement after serving less than half his sentence from a facility that reported no positive COVID-19 cases at the time of his release. *See* Hannah Albarazi, *Paul Manafort Seeks Prison Release Over COVID-19 Fears*, Law360 (Apr. 14, 2020), https://www.law360.com/articles/1263706/paul-manafort-seeks-prison-release-over-covid-19-fears (noting that the prisoner's counsel had argued that the CARES Act "broadens the authority" of the BOP to release prisoners to home confinement); Khorri Atkinson, *Paul Manafort Released From Prison Amid COVID-19 Fears*, Law360 (May 13, 2020), https://www.law360.com/articles/1273090/paul-manafort-released-from-prison-amid-covid-19-fears.

[3] The Sentencing Guidelines also require that to be granted a reduction of sentence under 18 U.S.C. § 3582(c)(1)(A), the defendant must not pose "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

release motions). However, the Ninth Circuit recently held "that the current version of U.S.S.G. § 1B1.13 is not an 'applicable policy statement[ ]' for 18 U.S.C. § 3582(c)(1)(A) motions filed by a defendant." *United States v. Aruda*, __F.3d__, No. 20-10245, 2021 WL 1307884, at *4 (9th Cir. Apr. 8, 2021). "In other words, the Sentencing Commission has not yet issued a policy statement 'applicable' to § 3582(c)(1)(A) motions filed by a defendant." *Id.* The Ninth Circuit clarified that "[t]he Sentencing Commission's statements in U.S.S.G. § 1B1.13 may inform a district court's discretion for § 3582(c)(1)(A) motions filed by a defendant, but they are not binding." *Id.* (citing *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020)).

In so holding, the Ninth Circuit joined the five other circuits who have addressed this issue and have unanimously held "that U.S.S.G. § 1B1.13 only applies to § 3582(c)(1)(A) motions filed by the BOP Director, and does not apply to § 3582(c)(1)(A) motions filed by a defendant." *Id.*; *see, e.g.*, *United States v. Brooker (Zullo)*, 976 F.3d 228, 237 (2d Cir. 2020) ("[T]he First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion."); *United States v. Jones*, 980 F.3d 1098, 1111 (6th Cir. 2020) ("In cases where incarcerated persons file motions for compassionate release, federal judges may skip step two of the § 3582(c)(1)(A) inquiry and have full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13."); *Gunn*, 980 F.3d at 1181 ("[T]he Guidelines Manual lacks an 'applicable' policy statement covering prisoner-initiated applications for compassionate release. District judges must operate under the statutory criteria—'extraordinary and compelling reasons'—subject to deferential appellate review."); *United States v. McCoy*, 981 F.3d 271, 284 (4th Cir. 2020) ("In short, we agree with the Second Circuit and the emerging consensus in the district courts: There is as of now no 'applicable' policy statement governing compassionate-release motions filed by defendants under the recently amended § 3582(c)(1)(A), and as a result, district courts are 'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" (citation omitted)); *United States v. Maumau*, __ F.3d __, 2021 WL 1217855, at

5

*12 (10th Cir. Apr. 1, 2021) ("We therefore agree with the district court that under the second part of § 3582(c)(1)(A)'s test, its finding that extraordinary and compelling reasons warranted a reduction in Maumau's case was not constrained by the Sentencing Commission's existing policy statement, U.S.S.G. § 1B1.13.").

In the past, when moving for relief under 18 U.S.C. § 3582(c), it was recognized that the defendant bore the initial burden of demonstrating that a sentence reduction was warranted. *See United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998). Although the Ninth Circuit has not specifically addressed the question of which party bears the burden in the context of a motion for compassionate brought pursuant to § 3582(c) as amended by the FSA, district courts that have done so have agreed that the burden remains with the defendant. *See, e.g.*, *United States v. Greenhut*, No. 2:18-cr-00048-CAS, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020); *United States v. Van Sickle*, No. 18-cr-0250-JLR, 2020 WL 2219496, at *3 (W.D. Wash. May 7, 2020).

## ANALYSIS

As district courts have summarized, in analyzing whether a defendant is entitled to compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), the court must determine whether a defendant has satisfied three requirements:

> First, as a threshold matter, the statute requires defendants to exhaust administrative remedies. 18 U.S.C. § 3582(c)(1)(A). Second, a district court may grant compassionate release only if "extraordinary and compelling reasons warrant such a reduction" and "that such reduction is consistent with applicable policy statements issued by the Sentencing Commission. *Id.* Third, the district court must also consider "the factors set forth in Section 3553(a) to the extent that they are applicable." *Id.*

*Rodriguez*, 424 F. Supp. 3d at 680; *see also United States v. Ramirez-Suarez*, 16-CR-00124-LHK-4, 2020 WL 3869181, at *2 (N.D. Cal. July 9, 2020); *Parker*, 461 F. Supp. 3d at 973–74; *United States v. Trent*, No. 16-cr-00178-CRB-1, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9, 2020) (noting that as to the third factor, under 18 U.S.C. § 3582(c)(1)(A) release must be "consistent with" the sentencing factors set forth in §3553(a)).

/////

### A. Administrative Exhaustion

Defendant Jameson asserts that he submitted an administrative request to the Warden at FCI Sheridan seeking his compassionate release on August 1, 2020. (Doc. No. 29-1 (Declaration of Defendant) ¶ 1.) Defendant states that as of the date that his pending motion was filed on February 3, 2021, he had not received a response to that request from the Warden. (*Id.* ¶ 2; *see also* Doc. No. 29 at 13.) The government concedes that defendant has exhausted his administrative remedies. (Doc. No. 37 at 7.) Because a failure to exhaust administrative remedies where such is required is normally viewed as an affirmative defense, the government's concession on this point is dispositive. Therefore, the court will turn to the merits of defendant's motion.

### B. Extraordinary and Compelling Reasons

"Extraordinary and compelling reasons" warranting compassionate release may exist based on a defendant's medical conditions, age and other related factors, family circumstances, or "other reasons." U.S.S.G. § 1B1.13, cmt. n.1 (A)–(D). Even though the catch-all of "other reasons" was included in the policy statement at a time when only BOP could bring a compassionate release motion, courts have agreed that it may be relied upon by defendants bringing their own motions under the FSA. *See, e.g.*, *United States v. Kesoyan*, No. 2:15-cr-236-JAM, 2020 WL 2039028, at *3–4 (E.D. Cal. Apr. 28, 2020) (collecting cases).

Thus, the medical condition of a defendant may warrant compassionate release where he or she "is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory)," though "[a] specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required." U.S.S.G. § 1B1.13, cmt. n.1 (A)(i). Non-exhaustive examples of terminal illnesses that may warrant a compassionate release "include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia." *Id.* In addition to terminal illnesses, a defendant's debilitating physical or mental condition may warrant compassionate release, including when:

/////

/////

> The defendant is
>
> > (I) suffering from a serious physical or medical condition,
> >
> > (II) suffering from a serious functional or cognitive impairment, or
> >
> > (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.* at cmt. n.1 (A)(ii). Where a defendant has moderate medical issues that otherwise might not be sufficient to warrant compassionate release under ordinary circumstances, some courts have concluded that the risks posed by COVID-19 tips the scale in favor of release in particular situations. *See, e.g.*, *United States v. Rodriguez*, 451 F. Supp. 3d 392, 405–06 (E.D. Pa. 2020) ("Without the COVID-19 pandemic—an undeniably extraordinary event—Mr. Rodriguez's health problems, proximity to his release date, and rehabilitation would not present extraordinary and compelling reasons to reduce his sentence. But taken together, they warrant reducing his sentence.").

Compassionate release may also be warranted based on a defendant's age and other related factors. In these situations, "extraordinary and compelling reasons" exist where a "defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." U.S.S.G. § 1B1.13, cmt. n.1(B).[4] In determining a defendant's projected release date, courts may take into account any "good time credits" awarded to the defendant by BOP for "exemplary" behavior in prison as set forth in 18 U.S.C. § 3624(b)(1). *See, e.g.*, *United States v. Burrill*, 445 F. Supp. 3d 22, 24 n.1 (N.D. Cal. 2020).

Here, defendant Jameson argues that extraordinary and compelling reasons warranting his compassionate release exist due to his medical conditions and alleged susceptibility to serious

---

[4] Because defendant Jameson is only 29 years old, (*see* PSR at 3), these age and age-related factors are irrelevant to the court's disposition of the pending motion.

8

illness were he to contract COVID-19.  To qualify for compassionate release, defendant must demonstrate that he is suffering from some "serious" medical condition "that substantially diminishes [his] ability . . . to provide self-care" in FCI Sheridan and the medical condition is one "from which he . . . is not expected to recover."  U.S.S.G. § 1B1.13, cmt. n.1 (A)(ii).  When the presentence report was prepared in this case, defendant reported that he suffered from various physical and mental ailments.  (PSR at 18–19.)  At that time, it was recounted that defendant had a history of suffering from asthma, but was not on medication with respect to that condition, and had also a history of seizures, the most recent of which occurred about a year before he was sentenced in this case.  (*Id.* at 18.)  In November 2016, defendant was diagnosed with major depressive disorder (single episode), anxiety, and obesity.  (*Id.* at 19.)  In December 2016, he was diagnosed with chronic post-traumatic stress disorder and elevated blood pressure without a diagnosis of hypertension.  (*Id.*)  Defendant's medical records confirmed that he was taking various prescription medication, including those for his depression and anxiety.  (*Id.* at 18–19.)  Finally, in December 2017 around the time of his arrest in this case, defendant was admitted to a hospital for suicidal-homicidal ideation.  (*Id.* at 19.)

In his pending motion, defendant argues that his obesity, depressive disorder, epilepsy, and asthma conditions—combined with his risk of contracting a severe illness from COVID-19— justify his compassionate release from prison.  (Doc. No. 29 at 16–25.)  The government appears to concede that defendant in fact suffers from these medical conditions but argues that only one of those conditions—defendant's obesity—places him at greater risk of contracting a severe illness from COVID-19.  (*See, e.g.*, Doc. No. 37 at 2.)  According to the medical documentation submitted in connection with the pending motion for compassionate release, defendant does suffer, for the most part, from the medical conditions he cites as the basis for his compassionate release.  First, defendant is considered obese given his most recent weight as recorded by the BOP.[5]  Second, according to the most recent BOP medical records listing his health issues,

---

[5] The parties dispute defendant's body mass index ("BMI").  At the time the presentence report was prepared in early 2018, defendant was 5'7" and weighed 170 pounds.  (PSR at 3.)  According to the most recent medical evidence available, prepared by the BOP in late 2018, defendant's height was confirmed to be 5'7" but he then weighed 218 pounds.  (Doc. No. 41 at 3 (sealed).)

defendant reportedly suffers only from major depressive disorder, recurrent, with psychotic features. (*See* Doc. No. 29, Ex. D, at 25, 45.)[6] Although the BOP medical staff has not diagnosed defendant as suffering from epilepsy, it is noted that he reported having a seizure and related issues in May 2019. (*Id.* at 2.) Further, while the BOP does not list defendant's asthma condition and he is not currently prescribed an inhaler, (*see id.* at 29 (listing active prescriptions)), other medical evidence before the court reflects that defendant has a history of asthma of an unspecified severity, (*see* Doc. No. 29, Ex. F, at 28 (summary of defendant's asthma attack suffered after being stung by a bee and the EpiPen's needle broke).) Last, the court observes that defendant received his first dose of the COVID-19 vaccine on January 13, 2021. (Doc. No. 41 at 2 (sealed).) It appears to be undisputed that, as of the date of this order, defendant has "in all likelihood" received both doses of the COVID-19 vaccine. (*See* Doc. Nos. 37 at 7; 43 at 2 (not contesting that defendant has since received the second dose of the vaccine but defense arguing vaccines do not necessarily fully protect one against new COVID-19 variants).)

According to the U.S. Centers for Disease Control and Prevention ("CDC"), defendant is at higher risk of a severe illness were he to contract COVID-19 because he is considered to be medically obese. *See COVID-19: People at Increased Risk*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last visited Apr. 14, 2021). Second, defendant "might" be at an increased risk of severe illness due to his epilepsy, which is considered to be a neurological disease.[7] *See id.* Accordingly,

---

Although defendant was medically overweight prior to his sentencing, with a BMI of 26.6, he is now considered obese because his BMI has increased to 34.1. *See Adult BMI Calculator*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (last visited Apr. 14, 2021). The court recognizes that although defendant's height is listed as 5'5" in one of his medical records prepared on November 29, 2016, (Doc. No. 29, Ex. E, at 5, 8, 19), other more recent sources reflect his height as 5'7."

[6] Due to the file size of the sealed exhibits in connection with the pending motion, defense counsel provided the court with the exhibits using an online file-sharing service.

[7] A neurological disease affects the "brain, spinal cord, and nerves" and includes "[s]eizure disorders, such as epilepsy[.]" *Neurologic Diseases*, U.S. NATIONAL LIBRARY OF MEDICINE, https://medlineplus.gov/neurologicdiseases.html (last visited Apr. 14, 2021).

defendant suffers from two comorbidities.  *See id.* ("The more underlying conditions someone has, the greater their risk is for severe illness from COVID-19.").

However, the court concludes that defendant is not at higher risk of contracting a severe illness because of his depression or asthma condition.  First, it is unclear whether depression necessarily causes a weakened immune system in individuals as a general matter,[8] nor has the court been presented with evidence suggesting that defendant Jameson's depression in particular has made him immunocompromised.  Regardless, the CDC limits the at-risk category to an "[i]mmunocompromised state (weakened immune system) *from blood, bone marrow, or organ transplant*; HIV; use of corticosteroids; or use of other immune weakening medicines." *Id.* (emphasis added).  While it is true that the CDC states that "[m]any conditions and treatments can cause a person to be immunocompromised or have a weakened immune system[,]" the CDC appears to confine this at-risk category to the most severe forms of a weakened immune system by providing specific conditions, unlike other at-risk categories which the CDC states in more general terms.  *Cf. id.* (listing "Cancer," "Heart Conditions and Other Cardiovascular and Cerebrovascular Diseases," and "Liver disease," among others).  Thus, defendant's depression does not place him at risk for a severe illness from COVID-19.  Second, according to the CDC, defendant is not even potentially at higher risk of suffering a severe illness from COVID-19 due to his asthma condition.  *See id.* (explaining that a "moderate-to-severe asthma" condition "might" increase the risk of severe illness, but not commenting on whether mild asthma can also potentially place individuals at greater risk).  Although it is true that defendant has suffered from asthma in the past, it does not appear that condition is one which currently plagues him and he is not prescribed an inhaler by the BOP even though he is currently takings other medications.  But

---

[8] The articles cited by defendant appear to stand for the proposition that depression "may lead to subsequent maladaptive immune . . . changes," not that this is necessarily true for every person suffering from depression. (*See, e.g.*, Doc. No. 29 at 19 n.8 (citation omitted).)  Other articles cited by defendant suggest that stress, which can be both a cause and effect of depression, may lead to a weakened immune system. (*See id.*)  However, if stress were enough to find that an inmate has a weakened immune system for purposes of identifying COVID-19 comorbidities, then virtually every inmate could seek release based on at least one comorbidity, since it is reasonable to presume that being imprisoned is stressful for every prisoner.

11

even assuming defendant is presently suffering from asthma, all the medical evidence submitted in connection with the pending motion indicates that his condition is not moderate-to-severe but is instead a mild form of asthma, rarely causing issues.  *See Adult-Onset Asthma*, WEBMD, https://www.webmd.com/asthma/guide/adult-onset-asthma (last visited Apr. 14, 2021) (noting that "[s]ymptoms occur daily" for a moderate asthma condition, whereas "[n]o medications are needed for long-term control" of mild asthma).  As explained in the presentence report, defendant was discharged from the U.S. Marine Corps for failing to disclose his asthma condition purportedly at the request of his military recruiter, who told defendant "not to list his medical condition because he had not had an asthma attack since he was 9 years old" and that "the military was only concerned with medical conditions present from age 13 and beyond."  (PSR at 15.)  Therefore, even by defendant's own statements made in preparation for his sentencing in this case, he rarely experiences symptoms from his asthma condition.  Thus, the court can only conclude based upon the evidence before it that defendant suffers from, at the most, mild asthma and he is not at higher risk of suffering a severe illness were he to contract COVID-19 based on that condition.

Even though defendant might theoretically be at higher risk of severe illness from COVID-19 based on his obesity and epilepsy, the court must assess his risk in light of the current circumstances presented.  Defendant Jameson received both doses of the COVID-19 vaccine, likely by mid-February, making him fully vaccinated at this point.  While the CDC recommends that individuals who are fully vaccinated continue to take at least some measures to reduce the risk of spreading the virus, it notes that "[c]urrently authorized vaccines in the United States are highly effective at protecting vaccinated people against symptomatic and severe COVID-19." *COVID-19: Interim Public Health Recommendations for Fully Vaccinated People*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html (last visited Apr. 14, 2021); *see also id.* ("Additionally, a growing body of evidence suggests that fully vaccinated people are less likely to have asymptomatic infection and potentially less likely to transmit SARS-CoV-2 to others.").  Accordingly, the risk to defendant Jameson of contracting a severe illness from COVID-19 is, at this point, purely

1   speculative.  So is defendant's contention that the vaccine he has been administered will not

2   protect against other variants of COVID-19.  (*See* Doc. No. 43 at 2–5.)  Although the scientific

3   community is cautious in predicting if the currently available vaccines will remain effective

4   against any new or unknown COVID-19 variants, there is little to no evidence supporting

5   defendant's claim.  According to the CDC, there are no current "high consequence" COVID-19

6   variants, *i.e.*, a variant with "clear evidence that prevention measures or medical countermeasures

7   (MCMs) have significantly reduced effectiveness relative to previously circulating variants."  *See*

8   *COVID-19: SARS-CoV-2 Variant Classifications and Definitions*, CENTERS FOR DISEASE

9   CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/variant-

10  surveillance/variant-info.html (last visited Apr. 14, 2021).  Therefore, defendant has failed to

11  meet his burden on this point.  *See Greenhut*, 2020 WL 509385, at *1 ("The defendant bears the

12  initial burden to put forward evidence that establishes an entitlement to a sentence reduction.").

13         Based on the foregoing, the court cannot conclude for purposes of compassionate release

14  that defendant Jameson, who is now fully vaccinated, is "suffering from a *serious* physical . . .

15  condition . . . from which he . . . is not expected to recover."  *See* U.S.S.G. § 1B1.13, cmt. n.1

16  (A)(ii) (emphasis added).  But even if the court did make that determination, defendant has not

17  established that his obesity and epilepsy "substantially diminish[] [his] ability . . . to provide self-

18  care" in FCI Sheridan.  *See id.*  According to his BOP medical records, defendant Jameson

19  receives regular medical care while in prison, "[a]ppears well[,]" and reported no pain as recently

20  as November 2020—which is over a year after he reportedly suffered from his latest seizure.  (*See*

21  Doc. Nos. 41 at 3, 6 (sealed); *see also* 29, Ex. D, at 2 (reporting the seizure occurred in May

22  2019).)  In January 2021, defendant signed an "Agreement to Participate in the Resolve

23  Psychology Treatment Program" offered by the BOP after it was determined that he qualified for

24  that program.  (Doc. No. 41 at 7 (sealed).)  The medical evidence submitted in connection with

25  the pending motion indicates that defendant is receiving adequate medical care from the BOP,

26  which is further evidenced by the fact that he received the COVID-19 vaccine in January 2020—a

27  month after the very first dose was administered in this country and likely before most Americans

28  /////

were eligible to receive the vaccine.[9] (*See generally* Doc. Nos. 29, Ex. D; 41.) It is true that FCI Sheridan suffered through a moderate COVID-19 outbreak, with 57 inmates and 13 staff members who tested positive being reported as having recovered, and no deaths attributed to the virus. *See COVID-19*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited Apr. 14, 2021).[10] As of the date of this order, however, there are currently only five staff members and one inmate at that prison who have tested positive with active cases of COVID-19.[11] *Id.* Because it appears that current active cases among prisoners at FCI Sheridan have been reduced to nearly zero, adding COVID-19 to the equation does not tip the scales in favor of defendant Jameson's compassionate release. At this point, it is unclear how or why defendant Jameson would fare any better outside of prison than inside FCI Sheridan with respect to the risk posed to him by COVID-19. He is doing well, receives regular medical care, is fully vaccinated, and his prison has contained the spread of the further virus at the moment. Accordingly, there is no basis upon which the court could conclude that defendant is "substantially diminishe[d]" in his ability to "provide self-care" at FCI Sheridan. *See* U.S.S.G. § 1B1.13, cmt. n.1 (A)(ii).

For all of the reasons explained above, defendant has failed to carry his burden in demonstrating that his medical condition and the risk to him of suffering a serious illness at the hands of COVID-19 entitle him to a sentence reduction. *See Greenhut*, 2020 WL 509385, at *1. Therefore, in this case, the court does not find extraordinary and compelling reasons justifying compassionate release pursuant to § 3582(c)(1)(A).

/////

/////

---

[9] *See* Sharon Otterman, *'I Trust Science,' Says Nurse Who Is First to Get Vaccine in U.S.*, N.Y. TIMES (Dec. 14, 2020), https://www.nytimes.com/2020/12/14/nyregion/us-covid-vaccine-first-sandra-lindsay.html.

[10] FCI Sheridan has a total population of 1,449 inmates. *FCI Sheridan*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/she/ (last visited Apr. 14, 2021).

[11] While the undersigned does not necessarily accept these reported numbers at face value in light of current CDC guidelines with respect to both testing and the manner of counting "active cases," there is also no evidence before the court challenging those reported numbers in this case.

**C.      Consistency With the § 3553(a) Factors**

Because the pending motion fails to establish extraordinary and compelling reasons justifying compassionate release in this case, the court need not address whether any reduction in defendant's sentence would be consistent with consideration of the sentencing factors set forth at 18 U.S.C. § 3553(a).[12] Nonetheless, the court notes that defendant pleaded guilty to an extremely serious federal offense relating to terrorism.  The presentence report prepared in his case suggests a lack of remorse on his part after the FBI thwarted his terrorist plot.  (PSR at 9–11.)  While defendant's advisory sentencing guideline range would have been far higher, defendant pleaded guilty to an offense carrying a maximum penalty of 240 months in prison.  (*See id.* at 25.)  The sentencing judge followed the parties' recommendation that a "reasonable and appropriate" sentence in this case was one of 180 months in prison.  (*See id*; Doc. Nos. 22 at 7; 36 (Sentencing Hr'g Tr.) at 10.)

Defendant, who was arrested in late December 2017 and sentenced in early August 2018, has served a little over three years (or 39+ months) of his 15-year sentence to date.  (*See* Doc. Nos. 8, 28.)[13]  Taking into account good time credits earned, defendant has likely served approximately 25% of his sentence.  In the undersigned's view, a 39-month sentence (and 141-month reduction from the sentence originally imposed) would not reflect the seriousness of defendant's offense of conviction, promote respect for the law, provide just punishment, or afford

---

[12] Title 18 U.S.C. § 3553(a) provides that, in determining the sentence to be imposed, the court shall consider:  the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, protect the public from further crimes of the defendant and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences available; the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; any pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

[13] For purposes of this calculation, the court assumes that defendant began receiving credit for his prison sentence when he was arrested in late December 2017.

adequate deterrence to criminal conduct.  *See* § 3553(a); *see also United States v. Purry*, No. 2:14-cr-00332-JAD-VCF, 2020 WL 2773477, at *2 (D. Nev. May 28, 2020); *United States v. Shayota*, No. 1:15-cr-00264-LHK-1, 2020 WL 2733993, at *5–6 (N.D. Cal. May 26, 2020) ("The length of the sentence remaining is an additional factor to consider in any compassionate release analysis, with a longer remaining sentence weighing against granting any such motion." (citation omitted)).  Because the court concludes that granting defendant Jameson's compassionate release at this time would be inconsistent with the appropriate consideration of the § 3553(a) sentencing factors, his motion will be denied on this basis as well.[14]

## CONCLUSION

For the reasons explained above, the court concludes that defendant has not demonstrated that "extraordinary and compelling reasons" exist warranting his compassionate release from prison.  Moreover, the court also finds that the granting of release is not consistent with consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a).  Accordingly, defendant Jameson's motion for compassionate release (Doc. No. 29) is denied.

IT IS SO ORDERED.

Dated:  **April 14, 2021**                              /s/ Dale A. Drozd
                                                                              UNITED STATES DISTRICT JUDGE

---

[14] Defendant Jameson cites a case in which another defendant convicted of providing material support to a foreign terrorist organization was granted compassionate release.  (Doc. No. 29 at 12) (citing *United States v. Ferizi*, No. 1:16-cr-00042-LMB (E.D. Va. Dec. 3, 2020), Doc. No. 105.)  The defendant's conduct in that case involved hacking a computer and providing government and military emails and other personal identifying information to a foreign terrorist organization.  *Ferizi*, No. 1:16-cr-00042-LMB, Doc. No. 105 at 1–2.  The court in *Ferizi* noted that the "defendant's offense did not involve violence," *id.* at 7, which stands in stark contrast to defendant Jameson's conduct in this case where he devised a plan—that he appeared capable of carrying out—to detonate explosives at a heavily-trafficked location in San Francisco with the intention of creating a "funnel" of people escaping the explosion so defendant could more easily shoot them, (PSR at 8).  Simply put, the decision in *Ferizi* has little applicability to the circumstances of this case.